## UNION PACIFIC RAILROAD COMPANY *vs.* CREDIT MOBILIER OF AMERICA.

Suffolk. Nov. 20, 1879; March 8, 1882; March 27. — Sept. 4, 1883.

MORTON, C. J., DEVENS & COLBURN, JJ., did not sit.

A bill in equity, brought by a railroad corporation against a construction company, to restrain an action at law, brought by the company against the corporation, to recover sums of money alleged to be due for building its railroad, can be maintained only on the equity which the stockholders in the corporation have, if the bill proceeds upon the ground that the work was done under a contract entered into by the corporation with an irresponsible person, through the fraudulent procurement of the managing director of the corporation and for his personal benefit, which contract was assigned to the construction company, with the assent of the directors of the corporation, many of whom were interested in the construction company, although there are creditors of the corporation, and among them is the government which granted its charter.

By the terms of the charter of a railroad corporation, the subscription books were to be kept open until $100,000,000 should be subscribed, and persons were to be allowed to subscribe at a late date on the same terms with the earlier subscribers, and one hundred miles of railroad were to be built within a certain time. Capitalists were unwilling to risk their money in the construction of the railroad, if others, after success was assured, could share the profits equally with themselves. The managing director of the corporation procured an irresponsible person to offer to construct a portion of the railroad, and procured the directors to accept the offer on behalf of the corporation. The managing director furnished this person with means to carry on the work, and took to himself the profits of the enterprise. He also had an agreement with this person, by which the contract should be assigned to such person as he should direct. The managing director intended that, if the scheme could be carried out, all of the stockholders of the corporation would have an opportunity to become interested in it, in proportion to the number of their shares of stock. Subsequently, a construction company was chartered, in which the managing director and other directors of the corporation were largely interested, and which had as its directors some of the directors of the corporation; the contract already made was assigned to this company with the assent of the directors of the corporation, and an opportunity was given to all the then stockholders of the corporation to become members of the company, and the road was built by the company. *Held,* on a bill in equity, brought by the railroad corporation against the construction company to restrain the prosecution of an action at law brought to recover sums of money due for building the road, that the managing director did not stand as to the contract procured by him in the relation of an undisclosed principal. *Held, also,* no actual fraud being found to exist, that the above facts did not show constructive fraud, so as to render the contract void in the hands of the construction company.

BILL IN EQUITY, filed April 10, 1876, to restrain the defendant, a corporation chartered by the State of Pennsylvania, from the prosecution of an action at law by the present defendant

against the present plaintiff, and now pending in this court, upon an account stated between the two corporations on March 28, 1867, for the sum of $1,994,769.96; for the additional sum of $268,850.17, alleged to be due on September 11, 1868; and upon a promissory note for $2,000,000, given by the present plaintiff to the present defendant in partial settlement of said account, and dated August 4, 1869.

Hearing, upon the pleadings and evidence, before *Endicott*, J., who reserved the case for the consideration of the full court.

The case was argued in November, 1879, by *S. Bartlett & F. Bartlett*, for the plaintiff, and by *W. G. Russell & G. Putnam*, (*G. F. Betts*, of New York, with them,) for the defendant; and was reargued in March, 1882, and in March, 1883, by *Bartlett & Bartlett*, for the plaintiff, and by *Russell & Putnam*, for the defendant.

C. ALLEN, J. This case is submitted to us upon the pleadings and a report of the whole evidence taken; without any finding of facts by the judge before whom it was heard.

Upon the pleadings, the plaintiff's case must depend upon the equity of its stockholders. It has, indeed, been suggested in argument, that the bill may be maintained on the equity of creditors. It appears incidentally in the course of the evidence that the government lent its security to the Union Pacific Railroad Company, to aid in the construction of the railroad; and that other indebtedness exists. But this is no substantive part of the plaintiff's case. The bill does not purport to be brought in the interest of the government, or of creditors; but it is made to rest expressly upon the equity of stockholders. Neither party contends, or admits, that any violation of the charter of the Union Pacific Railroad Company, or of its duty to the government, was involved in the transactions set forth. Both parties, indeed, at an earlier stage of the case, have united in a statement, and in an elaborate argument, to the contrary. The bill contains no averment whatever of any indebtedness of the plaintiff; and, of course, there is no statement of how much is due to creditors, and how much it is necessary to realize in order to supply any deficiency of other means and resources of the plaintiff to make such creditors whole. In considering the case, therefore, the equity of the plaintiff corporation, in behalf of its

stockholders, as against the defendant corporation, is alone to be considered.

It is also to be borne in mind that the relief sought for is founded upon the money and securities averred to have been received by the Credit Mobilier under the Hoxie contract, after its assignment to the defendant. There was testimony to the effect that, prior to such assignment, certain profits were realized under this contract by one Durant; but he is not a party to the suit, and no consideration need be given to the question of what rights the plaintiff might have as against him, except as this may affect the further question of its rights as against the defendant.

The facts, upon which the determination of the case must depend, not having been found by the single justice, it is expedient, in the first instance, to state the material facts, as they are found by us to exist, upon the evidence which has been introduced.

The Hoxie contract, so called, and other formal papers relating thereto, were as follows: By a proposition dated August 8, 1864, addressed "to the President and Committee on Contracts of the Union Pacific Railroad Company," and signed "H. M. Hoxie, by H. C. Crane, attorney," Hoxie proposed to enter into a contract to build and equip one hundred miles of railroad and telegraph, commencing at Omaha, according to certain specifications and upon certain terms and conditions. Appended to this proposition was a paper addressed to Hoxie, and signed "George T. M. Davis, Special Committee," as follows: "H. M. Hoxie, Esq., Dear Sir: You will please to go on with the work, under the above proposition, and, if the company do not accept it before the first day of October next, they will pay you upon the same terms and conditions for what work may be done, as shown by the estimates of the engineers, made as provided in this proposition, first giving you thirty days' notice that they do not accept. George T. M. Davis, special committee."

Underneath this paper was the following: "September 23, 1864. Above contract is approved and ratified. John A. Dix, C. S. Bushnell, George T. M. Davis."

The following additional papers were also executed between the same parties. "New York, October 4, 1864. To the President

and Executive Committee of the Union Pacific Railroad Company. On condition that your railroad company will extend my contract from its present length for one hundred miles, so as to embrace all that portion of the road between Omaha and the one hundredth meridian of longitude, I will subscribe, or cause to be subscribed, for five hundred thousand dollars of the stock of your company. Respectfully yours, H. M. Hoxie, by H. C. Crane, attorney.

" The above proposition is hereby accepted for and on behalf of the Union Pacific Railroad Company. John A. Dix, C. S. Bushnell, Geo. T. M. Davis, special committee. October 3, 1864."

At these dates, there were twenty-eight directors and two government directors of the Union Pacific Railroad Company, and an executive committee consisting of Dix, Bushnell, Davis, and four others. Dix was president and Durant was vice-president of the corporation. There was no evidence of the extent of the authority conferred upon the executive committee, or of the existence of any committee known as the committee on contracts. The bill, however, alleges that the proposition of August 8th was accepted by a committee of the board of directors of the Union Pacific Railroad Company on the 23d of September, 1864, and that the subsequent proposition of October 4, 1864, was accepted by a committee of said corporation by a writing bearing date the third day of the same month of October; and the answer admits that said propositions were accepted by the plaintiff, at or about the dates alleged in the bill.

On October 5, 1864, a new board of officers was elected, with fifteen directors and five government directors, and an executive committee of seven. With one exception, the fifteen directors thus chosen were members of the former board; with two exceptions, the executive committee remained the same as before, including Dix, Bushnell and Davis; Dix continued president, and Durant vice-president.

By a paper dated September 30, 1864, and executed at about that date, an agreement was made between Hoxie, for himself and as agent, and Durant, for the assignment of the contract for the construction of the one hundred miles of railroad and telegraph to Durant, or any party or parties he might direct. A paper dated October 7, 1864, was drawn up for signatures, at

about the time of its date, reciting the last-mentioned paper, and providing that the subscribers agreed to take an interest in the Hoxie contract to the extent set opposite their respective names. This paper was signed by Durant and others, but was not fully carried out, as hereinafter stated.

On or about March 15, 1865, various papers were executed as follows:

1. A letter from Hoxie, by H. C. Crane, attorney, to the president and directors of the Union Pacific Railroad Company, consenting to their terminating the contract for building one hundred miles of railroad.

2. An agreement between Hoxie and the Credit Mobilier, by which Hoxie assigned to it his contract with the Union Pacific Railroad Company, and the Credit Mobilier agreed to execute to said company a guaranty of the performance thereof, and to indemnify him from all claims under the same.

3. A guaranty of such performance, executed by the Credit Mobilier to the Union Pacific Railroad Company.

On April 6, 1865, the board of directors of the Union Pacific Railroad Company passed a resolution, accepting and recognizing the said assignment and guaranty, and ordering them and the Hoxie proposition or contract to be recorded in the directors' book of minutes. Another resolution was also adopted on the same day, that additional surveys and contracts for construction should be made as fast as the means of the company would properly justify.

Prior to the passage of these votes, Durant had proceeded with the work under the Hoxie contract, and taken to his own use such profits as arose therefrom. No other contracts were put in evidence; and the Credit Mobilier, after these votes, proceeded to build the railroad and telegraph, not only for the distance of one hundred miles, but to the one hundredth meridian, a point two hundred and forty-seven miles west from Omaha.

Assuming, without deciding, that the papers constituting the Hoxie contract were signed in such form and by such officers as to bind the Union Pacific Railroad Company, said contract was made and entered into with the expectation and understanding that Hoxie would assign it to Durant, or to such party or

parties as he should designate.   This understanding on Durant's part was with the view and in order that, if the scheme could be carried out on that basis, all the stockholders of the Union Pacific Railroad Company should have an opportunity to become interested in it, in proportion to the number of their shares. From the terms of the charter, it was thought impossible to raise money enough to build the railroad by inducing capitalists to subscribe to the stock.   Subscription books were to be kept open until $100,000,000 should be subscribed; and persons were to be allowed to subscribe at a late date, on the same terms with the earlier subscribers.   Capitalists were unwilling to risk their money in the construction of the railroad, if others, after success should be assured, could step in and share the profits equally with themselves.   It was sought, therefore, to adopt some plan by which the necessary funds could be raised, on terms which were considered more just, and which would induce stockholders and others to be willing to embark with additional capital in the enterprise.   Accordingly Durant, nominally the vice-president, but in fact the principal officer of the corporation, hit upon the method of making the Hoxie contract for the construction of a portion of the railroad beginning at Omaha, with the understanding that the contract should be under his control, and should be assigned as he might direct; and the papers of September 30 and October 7, 1864, were accordingly drawn up, for the purpose of carrying out this understanding.

The foregoing facts do not in our view constitute Durant an undisclosed principal in the contract, in any such sense as to show that he was the actual contractor instead of Hoxie.   He could not have been held responsible as principal.   The understanding and expectation that the contract should be assigned as he might direct did not have the effect to make him a principal. For the time being, Hoxie was the party, and the only party, bound to the Union Pacific Railroad Company for the performance of the contract; and Durant, while not personally bound upon it, nevertheless had the practical control of it, and, so far as Hoxie was concerned, might use that control either for his own benefit, or for the benefit of the stockholders.   It is quite immaterial whether Hoxie had knowledge of the persons who would probably become interested in it after it should be assigned.

In point of fact, an opportunity was offered to most of the stockholders of the corporation, and to others, to become parties to the agreement of October 7, 1864; but, though it was formally and ostensibly signed by Durant and others for the full amount specified as necessary, the parties were unwilling to carry it out on that basis, and the necessary money could not be raised, on account of the danger of personal liability.

It does not appear to be necessary to make a final determination whether every one of the stockholders of the Union Pacific Railroad Company had actual knowledge of the plan by which it was hoped to carry on the work under the Hoxie contract, prior to the assignment to the Credit Mobilier. That plan was abandoned as impracticable. It may have been found to be so, before all the stockholders were consulted as to the details. The testimony of Opdyke is to the effect that he has no recollection of being informed of some of the details. He appears to have been aware of the existence of the papers constituting the Hoxie contract, but thinks the contract was never regarded as binding on the company till after the votes of April 6, 1865. During all the intermediate time, he says, it was a subject of anxious discussion, in the board of directors, how to raise the funds requisite for the construction of the railroad, and all the directors felt that the stockholders should share in the profits of the construction. Various plans were suggested and considered by the board, and the assistance of able legal counsel was not wanting; and at last the discussions resulted in the formation of the Credit Mobilier, and in the plan which was finally adopted, by which it was considered that the desired objects could be accomplished.

When this plan was adopted, all the existing stockholders of the Union Pacific Railroad Company had an opportunity to take their proportionate number of shares in the Credit Mobilier. There was no unreasonable delay in arranging matters, nor any concealment of the Hoxie contract, or of the understanding or purpose with which it was made, from officers or stockholders of the Union Pacific Railroad Company, nor any complaint made by Opdyke, or any other person interested in that company, that any part of the arrangement was unreasonable or unfair. It is proper to look back to the state of things then existing. It was a time of war; the Union Pacific Railroad Company had neither

funds nor credit; subscribers to its stock could not be obtained; by the terms of its charter it was bound to finish one hundred miles of railroad by June 23, 1866, in order to prevent a forfeiture; and the directors were most anxiously engaged in devising and considering methods by which money enough could be raised to keep the company alive. The arrangement with the Credit Mobilier was the result of a most protracted discussion and deliberation, in which it is fair to assume that all of the directors of the company took part. It was thought, apparently on all hands, to be the best plan which could be adopted under the circumstances. The Hoxie contract was assigned; the Credit Mobilier guaranteed its performance; the Union Pacific Railroad Company, by its directors, then, if not before, recognized and adopted it; and all this was done without objection on the part of any person interested. If before that time any individual or peculiar benefits could be secured under the Hoxie contract, it was to be so no longer. In the future, at all events, all the stockholders could avail themselves of its advantages and profits, upon equal and proportionate terms, and without risk of personal liability.

It is urged, on behalf of the Union Pacific Railroad Company, that actual fraud and circumvention were used in procuring the assent of the corporation to a contract grossly excessive and disadvantageous to its interests, for the benefit of Durant, by obtaining from Dey, the chief engineer, false estimates of the cost of the work, and using the same in making the contract. The proof of actual fraud rests mostly upon Dey, who testifies to making an inflated estimate of cost for Durant, and by his direction.

Actual fraud depends upon the purpose and intent. It is said that the price was too high. But if so, and if it was designed to allow stockholders to participate in the profits, the high price does not of itself show that the transaction was fraudulent. Without now dwelling at all upon reasons why the price might naturally be made high, the stockholders who should become interested in the contract would have small occasion to complain, however it might be with the government, or with other creditors. There is no direct testimony that any director of the Union Pacific Railroad Company was misled, by the use of an

inflated estimate of cost, into making or approving of the contract. While it is no doubt true that such fraud may be established by indirect or circumstantial evidence, we do not find sufficient proof of it, upon a perusal of all the testimony bearing upon the question. The purpose with which the contract was made does not appear to have been fraudulent. No evidence is introduced to show that any director of the company ever complained of having been misled. The votes of April 6, 1865, were passed about four months after Dey had sent in his resignation, expressing as his reason that he' did not approve of the contract; and some time after he had been in further correspondence relating to the subject with Dix and with one of the government directors, Williams, in which, it is obvious, he had presented his objections to the contract. Apparently he was not aware of the arrangements or plans for allowing stockholders to become interested in it. The government director, however, as well as the president of the company, was put upon inquiry, under such circumstances that it is reasonable to suppose that adequate attention was given to the facts attending the making of the contract, and that it was not deemed expedient at the time to make any movement in the direction of modifying its provisions ; and that the price, though high, was nevertheless intelligently sanctioned and ratified by the formal votes of the directors, after being put upon inquiry, and making all the investigation which they wished to make. There was no occasion for Dey to be informed promptly of the business arrangements or plans of the directors, and the fact of his ignorance of them raises no presumption of fraud. And on the whole, and without dwelling in detail upon all the facts in evidence, — taking into view the purpose and object with which the contract was made ; the lack of concealment of this purpose and object; the omission of direct or indirect evidence to show that any officer or stockholder ever made complaint of having been misled ; — the fact that Dey, a dissatisfied man, was in correspondence with the president and with a government director of the railroad company, and expressed his objections to the contract, and apparently sought to prevent its ratification by the company ; — and the final votes of April 6, 1865, and the subsequent action thereunder, without objection or complaint from Dix, Williams, Opdyke, or any other

source : — we have come to the conclusion, upon this question of fact, that the charge of actual fraud is not sustained.

The question remains, whether the present bill can be maintained on the ground that the contract was fraudulent by construction of law.    This also depends largely upon the purpose with which the contract was made, and also upon that with which it was afterwards carried out.   It has already been shown that Durant's position was not that of an undisclosed principal to the contract.   It is not to be doubted, however, that an arrangement in form like that made in the present case, by which a third party is put forward as the principal contractor, may be constructively fraudulent, if the design is thereby to secure to a director of the corporation a separate and peculiar benefit to himself, and if that design is carried into execution.   We have no disposition to relax the strictness of the wholesome rules which prevent the managers of corporations from using their official positions as a means of personal profit to themselves. But where a contract is entered into between a corporation and a third person, and the control of it secured by a director of the corporation, for a purpose like that which we have found to have existed in the present case, and where that purpose has subsequently been carried out by an assignment of the contract to parties who have executed it in good faith, the circumstance that it was originally procured to be entered into by a director will not have the effect to render it fraudulent by construction in the hands of such assignees, or to enable the corporation to reclaim moneys paid under it, or to maintain a bill in equity to restrain the prosecution of an action at law for a note given in payment for work done under it.

It is contended that there was an original inherent vice or taint in the contract, which remains even after such assignment ; that there was not such a substitution of a new party as to constitute a novation ; and that the assignees stand on no better ground than the assignor.   It is, however, to be observed, that, in any instance, a contract of a corporation with its officer is not abso·lutely and *ipso facto* void; but it is voidable.   The corporation may perhaps disclaim it, if it chooses to do so.   If the contract, however, proves to be a profitable one for the corporation, the corporation may hold the contracting officer to its performance.

He cannot escape responsibility, though the corporation may. It is not accurate to say, in such case, that the contract becomes valid by reason of the ratification by the corporation. No ratification is necessary. The contract stands, unless avoided or repudiated. So long as the contract is held under the control of a director or officer, for his own benefit, it may well be conceded, so far as the determination of the present case is concerned, that the corporation may repudiate it at will. But if the reason for such repudiation has ceased, on account of an assignment to a new party, who at the request of the corporation guarantees its fulfilment, a technical ratification is not necessary. The contract then stands by its own force, there being no longer a right of repudiation.

In the present case, upon the facts which we have found to exist, there was no such original vice or taint in the contract itself, or in the purpose for which it was designed ultimately to be used, as to render it fraudulent by construction of law. If this purpose was in any respect departed from by Durant, either before or after it was possible to carry it out fully, or if he sought in any respect to exercise for his own benefit his practical control over the contract, or if he realized (as the testimony tends to show that he did) any peculiar benefits or profits from it before its assignment to the Credit Mobilier, the rights of the plaintiffs as against him in respect to such transactions are not involved in the case before us, and cannot be now determined. But when Durant exercised such practical control over the contract by procuring an assignment of it to the Credit Mobilier, in accordance with the plan which had been settled on by the Union Pacific Railroad Company, upon a full discussion and consideration of the best practicable methods for constructing its railroad, and after being put upon inquiry and making all the investigation which they cared to make, the element of a possible constructive fraud by an improper use of the contract disappeared.

If the contract had been originally made, without actual fraud, on the 6th of April, 1865, directly with the Credit Mobilier, it is plain that it could not now be avoided by the plaintiff. The fact that some directors were common to both corporations, and that Durant and others had large interests in both, would not

render the contract invalid, as matter of law. It would be necessary to show in addition an actual fraudulent intent; and this inference would be effectually repelled by the circumstance that all the stockholders of the Union Pacific Railroad Company had an opportunity, and were invited, to become stockholders in the Credit Mobilier, on fair terms, and by the other facts and circumstances existing at the time. The element of a peculiar personal advantage to any officer of the plaintiff company would thus be removed. Whenever this element does not exist, the rule of constructive fraud, if applied, would be merely an arbitrary one; and whenever such peculiar personal advantage ceases to exist, the chief reason for the application of the rule also ceases.

Assuming it to be true that there was not such a substitution of parties as would constitute a technical novation, the fact remains that nobody but Hoxie was bound by the contract for the construction of the specified portion of the railroad. He was notoriously without adequate means to make his promise valuable. The Credit Mobilier took an assignment of all his rights under the contract, and executed to the Union Pacific Railroad Company a guaranty for the performance of it; Hoxie, it is true, remained personally liable on his agreement, but he had parted with his interest in it, and in actual effect his position became like that of a surety; his interest in the contract was gone, and his only relation to the Union Pacific Railroad Company consisted in his personal liability for the performance of the contract which he had assigned, and which the Credit Mobilier, for its own benefit, had assumed and undertaken to carry out. Durant was never personally liable upon the contract, and his only relation to it was, at the most, as the party receiving for the time being what came from the Union Pacific Railroad Company, as compensation for the work and materials for which he furnished the means. This relation was abandoned by the assignment to the Credit Mobilier. There was a complete substitution of the latter corporation for Durant, in all the relation in which he ever stood to the contract, or to the plaintiffs under the contract. Thereupon, with full knowledge of all the facts, or at least with all such knowledge as they cared to have, the directors passed the votes of April 6, 1865, which created the Hoxie contract, or

gave effect to it, or recognized it as valid from and after that date.   The object which the directors had at heart appeared to be then accomplished.   The scheme thus adopted would in their opinion prove safe and attractive to capitalists, and also afford to all the stockholders an opportunity to participate in the profits of the work under the contract on fair and equal terms.   If before that time there had been any peculiar or special benefit to any individual, it was to be so no longer.   So far as the future was concerned, every provision was made for securing alike the success of the work and justice to all the stockholders that the most anxious foresight could devise.   Under this state of facts, no wholesome or reasonable rule of policy is violated or impaired, by holding that a contract so made, for such a purpose, and so assigned in order the better to carry out that purpose, cannot be avoided by the corporation as against the assignee, after it has been executed by the latter, without complaint or objection on the part of the corporation, or of any of its stockholders.   Rules and maxims are not to be applied contrary to their true intent and spirit.

We are all of opinion, upon the facts found, that the case does not call for the application of the rule as to constructive fraud, which in a proper case we should not hesitate to enforce with strictness; but that the contract, from and after the votes of April 6, 1865, is to be treated as valid, between the Union Pacific Railroad Company and the Credit Mobilier, and free from any taint or vice impairing its efficacy.

*Bill dismissed.*