### In re KNOX AUTOMOBILE CO.

(District Court, D. Massachusetts. August 18, 1915.)

No. 19064.

1. CORPORATIONS ☞308—OFFICERS—SALARIES—POWERS OF BOARD OF DIRECTORS.

M. was the treasurer of a corporation whose business had been very prosperous during the year ending August 1, 1910. By the company's custom, salaries were fixed by the directors in January, but ran for one year from the preceding August. In January, 1911, M. demanded an increase in salary from $12,000 to $25,000, and the issuance to him of stock in the corporation previously authorized, but not issued, because of extraordinary services rendered by him during the preceding year. The directors objected, and the matter was left in abeyance and not settled

---

until August 2, 1911, after the expiration of the salary year. At that time M., to whom the company was then largely indebted, took the position that the company could either meet his terms or get another treasurer and arrange for payment of his indebtedness. The company was in no position to take this last alternative, and the directors, after considering the matter carefully, honestly and disinterestedly decided that it was best for the company to comply with M.'s demand, and it was voted to pay the $25,000 demanded and issue the stock in "part payment for his services to the company during the year." The corporation was not then insolvent, and did not become bankrupt for about 17 months thereafter. With the knowledge of the directors M. continued to draw salary at the increased rate until his death in the following June. The board of directors in office in January, 1911, did not go out of office until the following October. *Held*, that it was not beyond the powers of the directors to act in the matter after the expiration of the salary year, their own term of office not having expired.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1334–1349; Dec. Dig. ☜308.]

2. CORPORATIONS ☜308—OFFICERS—SALARIES—VALIDITY OF PAYMENT.

As M. was acting for himself in the transaction, and the corporation was adequately represented by its board of directors, the contract, after it had been executed by M., could not be set aside, and his estate charged with the difference between his original salary and the increased salary.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1334–1349; Dec. Dig. ☜308.]

3. CORPORATIONS ☜316—OFFICERS—DEALINGS WITH CORPORATIONS.

While the vote referred to the stock as payment for past services, it was demanded and granted as the price of M.'s future assistance and financial support, and was not a bonus or gift.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1401, 1402, 1404–1406, 1408, 1409, 1412–1414; Dec. Dig. ☜316.]

4. BANKRUPTCY ☜339—CORPORATIONS ☜308—OFFICERS—DEALINGS WITH CORPORATIONS.

Assuming that, because of M.'s fiduciary relation to the company, he had no right to acquire its obligations to such an extent as to give him power to coerce it into meeting his demands, the contract was merely voidable, and not void, and continued in force until the company rescinded it and offered to return what it had received thereunder, and an objection by creditors to the allowance of M.'s claim against the bankrupt estate of the corporation, without offsetting the value of the stock and the increase in salary, was not such a rescission; the corporation being no party to the proceedings.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 525, 526; Dec. Dig. ☜339; Corporations, Cent. Dig. §§ 1334–1349; Dec. Dig. ☜308.]

5. CORPORATIONS ☜314—OFFICERS—DEALINGS WITH CORPORATIONS.

The treasurer of a corporation took up its matured obligations for borrowed money with his personal funds and turned them over to the corporation in exchange for its note for the amount thereof plus a commission of 5 per cent. taken by him on the loan. The commission in question would have been reasonable and proper if paid to a third party, and a similar commission had been paid to third parties on loans previously obtained. Eight of the nine directors of the corporation learned of the transaction while the company was still operating, but neither they nor anybody on behalf of the company ever objected, and the company never rescinded the transaction, nor took any steps to do so, prior to becoming bankrupt, though the transaction was disclosed by its books. *Held*, that while, as the treasurer represented both himself and the corporation in the

transaction, it was voidable at the option of the company, it was ratified, and could not be set aside.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1393–1398, 1400; Dec. Dig. ⊂⇒314.]

6. CORPORATIONS ⊂⇒314—OFFICERS—DEALINGS WITH CORPORATIONS.
Officers of a corporation are not precluded from loaning money to it, so long as they deal fairly with it.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1393–1398, 1400; Dec. Dig. ⊂⇒314.]

7. BANKRUPTCY ⊂⇒339—CLAIMS—OBJECTIONS—RIGHT OF CREDITOR TO OBJECT.
After the appointment of a trustee in bankruptcy, objections to claims should be made and review proceedings, if advisable, taken by him, or, if he declines to act, by creditors proceeding in his name by order of the referee, and individual creditors should not be recognized in such matters.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 525, 526; Dec. Dig. ⊂⇒339.]

In Bankruptcy. In the matter of the Knox Automobile Company, bankrupt. On review of an order of the referee. Referee's order affirmed.

See, also, 210 Fed. 569.

Charles H. Beckwith, of Springfield, Mass., for creditor offering proof of debt.

Tyler, Corneau & Eames, of Boston, Mass., for creditors objecting to proof.

MORTON, District Judge. This is a petition by the Charles C. Lewis Company and other creditors of the Knox Automobile Company for review of an order made by Mr. Referee Bosworth allowing certain claims of Sutton et al., as administrators of the estate of Alfred N. Mayo, deceased, in the sum of $927,945.56. The case comes upon the referee's certificate, accompanied by the exhibits and a transcript of the testimony before him.

The claims are based principally on eight notes, of $100,000 each, made by the bankrupt and held by the claimants. The notes were given for money loaned by Mr. Mayo to the bankrupt, and their validity is not disputed. The controversy here presented concerns certain alleged offsets which, it is contended by the objecting creditors, should be allowed in favor of the bankrupt against the claim on the notes. These alleged offsets arise, speaking generally, out of certain payments of money and property made by the bankrupt to Mayo while he was its treasurer. Three principal items are involved:

(1) Payments to him as salary, or bonus, in excess, it is contended, of what he was entitled to receive, amounting to about $24,769.

(2) Stock in the bankrupt company improperly transferred to him, it is alleged, amounting at par value to $5,300 preferred and $136,400 common.

(3) Commissions taken by him on loans of $800,000 from him to the bankrupt, aggregating $40,000.

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

[1, 2] Considering first the item of salary:

The salary year of the company ran from August 1st to August 1st. The salaries were, by custom of the company, generally fixed by the directors in January following the beginning of the salary year; i. e., the salaries from August 1, 1910, to August 1, 1911, would be fixed in January, 1911. Mayo became treasurer of the company in January, 1909, and thereafter, while not controlling the stock, was undoubtedly the dominant personality in its management. Prior to August, 1910, his salary had been $12,000 per year. During the latter part of 1909 and the early part of 1910 large extensions of the plant had been made on his initiative and under his general direction. At this period the company, which had failed and reorganized in 1907–08, appears to have been very prosperous. Its book profit for the year ending August 1, 1910, was $337,771; its book surplus, $466,596. Although it had incurred a substantial indebtedness in connection with the extension of its plant, it began the year on August 1, 1910, in excellent condition.

When the directors came to fixing salaries in January, 1911, for the year which had begun the preceding August and was to end August 1, 1911, Mayo demanded an increase from $12,000 to $25,000 and the preferred and common stock now in question. This stock had been authorized in connection with the reorganization, but had never been issued. He based this demand at that time principally on extraordinary services rendered by him during the past year. The directors objected; the matter was left in abeyance and was not finally settled until August 2, 1911. The year for which the salary was being fixed had at that time expired. It is suggested that the directors had thereby lost power to act in the matter. But the board of directors did not go out of office until the following October; it was the same as in January. It was its duty to act on this matter of salary; and it could do so at any time during its term of office.

At a meeting of the board held on August 2, 1911, Mr. Mayo, to whom the company was then indebted to a large amount, took the position that the company could either meet his terms or get another treasurer and arrange to pay his indebtedness when it matured. The company's business had been unsuccessful during the year ending August, 1911, and it was in no position to take the latter alternative. The directors, after considering the matter carefully, honestly, and disinterestedly, decided that it was best for the company to comply with Mr. Mayo's demands, which was accordingly done. The vote as passed at that time is set out at length in the referee's certificate. The $25,000 so voted was paid, and the stock was duly issued to Mr. Mayo. No vote as to salaries for the year from August, 1911, to August, 1912, appears to have been passed by the directors in January, 1912; and Mayo continued to draw salary at the rate of $25,000 per year until his death on June 26, 1912. The difference between $12,000 per year and $25,000 per year from August 1, 1910, to June 26, 1912, constitutes the first item of offsets alleged.

The objecting creditors contend that the vote of August 2d did not fix the salary at $25,000, and that the $25,000 payment under it should

be regarded as a gift, or bonus, for past services. It is true that the vote itself does not expressly state that the $25,000 was voted as salary; the language of the vote is, "part payment for his services to the company during the year." But Mayo had demanded that amount of salary; the directors understood that they were dealing with a question of salary; no other action fixing Mayo's salary for the year ending August, 1911, was ever taken; the $25,000 was understood by Mayo and by the directors to be voted as salary; he continued to pay himself at that rate to the knowledge of the directors, without any objection being raised until his death. (Referee's Certificate, p. 6.) The $25,000 does not seem to me to have been a bonus for past services, but to have been salary for the year ending August 1, 1911, the amount of which had been left undetermined since the preceding January on account of the inability of the directors and Mayo to agree about it.

No misrepresentation, and no fraud, unless Mayo's coercive action be so regarded, entered into the agreement between him and the company as to his salary. He stated his terms, and the directors, however reluctantly, agreed to them. There is no finding that his services were not, under the circumstances, worth the amount demanded. On the contrary, the learned referee explicitly finds that "this salary of $25,000 a year * * * was fair and proper compensation for his (Mayo's) services," etc. (Certificate, p. 6.) The corporation was adequately represented by its board of directors, between whom and Mayo the agreement was finally reached. Of the nine directors, seven, besides Mayo, approved of the transaction. This item differs from the commission hereafter considered, in that Mayo was not, as treasurer, representing the corporation in contracting with himself as an individual. The corporation was not at that time insolvent; and the bankruptcy petition was not filed for about 17 months thereafter.

It is difficult to see upon what grounds the plaintiffs, who appear here only as creditors of the Knox Company, who have proved claims in the bankruptcy proceedings, have any standing to object to the transaction, which, it seems to me, could properly be assailed, if at all, only in proceedings between the corporation and Mayo. The respondents have not raised this point, however, and assuming, as the parties do, that the objecting creditors have such standing, it does not seem to me that the learned referee's findings on this matter were erroneous, nor that, after the contract has been executed by Mayo, this court ought to attempt to set it aside, and to charge his estate with the difference between his original salary of $12,000 and the increased salary of $25,000.

[3] As to the stock: In connection with his demand for an increase of salary, Mayo also demanded that the corporation should turn over to him the common and preferred stock above referred to. The directors were at first opposed to granting this demand. The stock payment and the increase of salary were considered together, and formed in effect a single transaction. As upon the salary question, so in this matter, Mayo did not undertake to represent the corporation. That was done by the board of directors, who, as above stated, acted honestly,

faithfully, and disinterestedly for it. It is clear that they, and probably the corporation itself, against objection, did not have power to give this stock to Mayo as a bonus or gift for past services. It does not seem to me that any such motive really influenced their action. Mayo took the same position as to this stock that he did as to the salary, viz., that the company could either comply with his terms or he would sever his connection with it and expect its obligations to him, and perhaps its notes which he had placed, to be paid when they matured in the following November. In other words, while he said that he was entitled to the stock for what he had done, and the vote refers to it as payment for past services, it was in reality demanded by him as the price of his future assistance and financial support to the company, and was transferred to him in order to obtain them, and not as a bonus or gift. It is not alleged that the directors acted fraudulently, and there is no suggestion in the evidence that they did so, nor is there any finding that the bargain was an imprudent one for the company. The transfer of the stock was effected at or about the time when the $25,000 was fixed and paid as salary. The company was not then insolvent, and did not fail for many months thereafter.

[4] It was suggested by counsel for the objecting creditors that Mayo, holding a fiduciary relation to the company, had no right to acquire its obligations to such an extent as gave him a coercive power, that his whole conduct with relation to the salary and stock was therefore fraudulent, that the directors acted under unjustifiable coercion, and that the corporation was not bound by their assent. It does not appear that Mayo acquired the notes and obligations of the company with any such purpose. The company did receive his assistance and financial support, so that he carried out his part of the bargain. He could not have been compelled to furnish such assistance and support, except upon terms acceptable to him. Even if this objection be sound, the result would be that the contract was voidable, not void, and continued in force until the company rescinded it and offered to return what it had received thereunder, Warren v. Para Rubber Co., 166 Mass. 97, at page 101, 44 N. E. 112; Parker v. Nickerson, 137 Mass. 487, at page 497. This objection is not such a rescission; the company is not a party to these proceedings. The questions arising on a rescission cannot be settled here. I therefore conclude that no offset is chargeable against the Mayo claim upon the stock transaction.

[5] As to the commissions: In November, 1911, the Knox Company had matured obligations for borrowed money amounting to $753,-000, some of which were held by Mayo personally, but a large amount of which were held by banks. Mayo took up these obligations with his personal funds. He turned over to the Knox Company $753,000 face value of its notes, and $7,000 in cash, a total of $760,000; and he took from it in return its notes for $800,000, which forms the basis of the claim by his estate. These notes are drawn with interest to follow. The deduction of $40,000 made by Mayo was not for interest, but for a commission of 5 per cent. taken by him on the loan. In this transaction, unlike the two preceding ones, nobody except Mayo seems to have acted for the company. He was, therefore, as treas-

urer of the company, dealing with himself as an individual. The same difficulty as to the right of these creditors to object and to take review proceedings exists in this instance as in the two preceding ones; but I pass it by, so far as possible, and consider the question, as it was presented by both parties, on the merits. This transaction was unquestionably voidable at the option of the company. Cases infra. Eight of the nine directors seem to have learned of it while the company was still operating; and neither they nor anybody on behalf of the company ever objected to what Mayo had done. The company never rescinded the transaction, nor took any steps to do so. The notes were duly entered on the books, and the whole transaction was there disclosed. The evidence well supports the referee's finding of ratification by the directors.

[6] The amount charged by Mayo as commission was the same per cent. that as treasurer of the company he had paid to certain banks in 1910 on the loans from them which he subsequently took up. The referee has found that the commission was not excessive and "would have been reasonable and proper" if paid by Mayo to a third party. The objecting creditors do not contend that the commission was per se excessive, or would have been improper if agreed to by Mayo as treasurer in a contract between the company and somebody else. They urge that Mayo himself had no right to make any profit on a transaction with the company. In this contention, as the cases cited below show, they overstate the law. If the company chose to rescind the contract it could do so; but it would still have to pay Mayo what was fair and reasonable for making the loan. The notes were not paid when they became due in the fall of 1912. The trustee stated at the hearing on these matters that the estate would pay in the neighborhood of 25 per cent. If so, Mayo not only made no profit out of his dealings with the company, but his estate stands to lose more than $500,000 by reason thereof. Officers of a corporation are not precluded from loaning money to it, so long as they deal fairly with it. Wyman v. Bowman, 127 Fed. 257, 277, 62 C. C. A. 189 (C. C. A. 8th Cir.); Union Pacific R. R. v. Credit Mobilier, 135 Mass. 367, 377. The other directors evidently did not then think that in making the loan, and charging the commission in question thereon, Mayo dealt unfairly by the company, and the result certainly does not indicate that he did so. It not appearing that the contract has been rescinded by the company, or that it was per se fraudulent, it follows that no offset from the claim is allowable in respect of said commissions.

[7] At the time when these objections to the Mayo claim were heard, a trustee had been appointed. Therefore he represented the estate. Objections to claims should have been made, and review proceedings, if advisable, have been taken by him, or, in case he declined to act, by creditors proceeding in his name by order of the referee. The practice followed of recognizing individual creditors in such matters, after the appointment and qualification of the trustee, is improper and objectionable, for the reasons stated in Re Lewensohn, 121 Fed. 538, 57 C. C. A. 600 (C. C. A. 2d Circuit), where the point was carefully considered and decided. As the point was not suggested by the

respondents, and as the case was prepared at considerable length, I have considered it, as far as possible, on its merits.

The order of the referee is affirmed.