**MULLONEY et al. v. UNITED STATES.** *

No. 2974.

Circuit Court of Appeals, First Circuit.
July 13, 1935.

Rehearing Denied Nov. 7, 1935.

*Writ of certiorari denied 56 S. Ct. 383, 80 L. Ed. ——.

Marvin C. Taylor and Franklin R. Chesley, both of Boston, Mass., for appellant Mulloney.

John P. Manning, of Boston, Mass. (Timothy F. Callahan, of Boston, Mass., on the brief), for appellant Deery.

John A. Canavan, Asst. U. S. Atty., of Boston, Mass. (Francis J. W. Ford, U. S. Atty., of Boston, Mass., on the brief), for the United States.

Before BINGHAM and WILSON, Circuit Judges, and MORRIS, District Judge.

BINGHAM, Circuit Judge.

This is an appeal from judgments of October 29, 1934, sentencing each of the defendants to imprisonment in the House of Correction at Plymouth, Mass., for a year and a day, the defendant Mulloney being found guilty as principal, and the defendant Deery as aider and abettor, upon the first count of an indictment under section 5209 of the Revised Statutes, as amended (USCA title 12, § 592), charging the misapplication of moneys, funds, and credits of the Federal National Bank of Boston. The indictment contained a second count charging the making of false entries in connection with the same transaction. On this count the defendants were

found not guilty. We are concerned, therefore, on this appeal with matters relating to the first count.

The material portion of the statute here involved reads as follows:

"§ 592. Any officer, director, agent, or employee of any Federal reserve bank, or of any member bank as defined in sections 221 to 225 of this title, who embezzles, abstracts, or willfully misapplies any of the moneys, funds, or credits of such Federal reserve bank or member bank * * * with intent * * * to injure or defraud such Federal reserve bank or member bank * * * and every person who, with like intent, aids or abets any officer, director, agent, employee * * * in any violation of this section shall be deemed guilty of a misdemeanor, and upon conviction thereof in any district court of the United States shall be fined not more than $5,000 or shall be imprisoned for not more than five years, or both, in the discretion of the court."

This indictment was found by a grand jury of the District Court for Massachusetts at its September term, 1933. In the first count of the indictment it was charged:

"That Daniel C. Mulloney, late of said District, throughout the period of time from January 1, 1930, to December 14, 1931, was president and a director of the Federal National Bank of Boston, in Boston, Massachusetts, which bank throughout said period of time was a national banking association theretofore organized and then and there existing and in operation and doing business under and by virtue of the laws of the United States concerning national banks, and which throughout said period of time was a member bank of the Federal Reserve Bank of Boston, Massachusetts, as designated by The Reserve Bank Organization Committee, to wit, in Federal Reserve District Number 1; and that as such officer and director of said member bank, said Daniel C. Mulloney throughout said period of time, had such a power of control, direction and management over the business and affairs of said member bank and over its moneys, funds and credits, and books and records, as enabled him to commit the offense in this indictment herein charged; and that said Daniel C. Mulloney during said period of time, to wit, on September 29, 1931, at said City of Boston, in said District of Massachusetts, as such officer and director, and with intent then and there to injure and defraud said member bank, unlawfully and feloniously did wilfully misapply the moneys, funds and credits of said member bank in the amount and of the value of one hundred thirty-one thousand dollars ($131,000.00), by then and there unlawfully and feloniously wilfully converting said one hundred thirty-one thousand dollars ($131,000.00) of the moneys, funds and credits of said member bank to the use and benefit of said John A. Deery and others to your grand jurors unknown, and not to the use or benefit of said member bank, by placing and taking into the assets [of the] member bank without the knowledge or consent of said member bank or its board of directors on said September 29, 1931, the demand promissory note of one Helen L. Ganley, dated on said date in the principal amount of one hundred thirty-one thousand dollars ($131,000.00), payable to said member bank, and which said sum of one hundred thirty-one thousand dollars ($131,000.00) was soon thereafter withdrawn from the assets of said member bank, and that on said September 29, 1931, as said Daniel C. Mulloney then and there well knew, said Helen L. Ganley was a woman of straw and a dummy note maker for said John A. Deery and unable to pay said note and that said note was then and there secured by wholly inadequate collateral and that said John A. Deery was then and there in a failing financial condition and unable to pay his just debts and obligations and not entitled to any credit in said member bank or in any well conducted bank, whereby and by reason of such misapplication of the moneys, funds and credits of said member bank as aforesaid, the said sum of one hundred thirty-one thousand dollars ($131,000.00) was almost wholly lost to said member bank.

"And the Grand Jurors aforesaid, on their oath aforesaid, do further present that on said September 29, 1931, at the City of Boston in said District of Massachusetts with intent then and there to injure and defraud said member bank, one, John A. Deery, late of said district, unlawfully and feloniously did aid and abet the said Daniel C. Mulloney so to wilfully misapply the moneys, funds, and credits of said member bank in the amount and of the value of one hundred and thirty-one thousand dollars ($131,000.00) as heretofore in this count of this indictment set forth."

The defendant Mulloney filed a motion for particulars which was granted in part and denied in part. The action of the court in so far as it denied the motion gives rise to the first assignment of error.

■ The purpose of a bill of particulars is the better to apprise the defendant of the crime charged to enable him properly to prepare his defense. It is not to furnish him in advance with the government's evidence and, if the indictment properly sets forth a crime, a motion of this character which would unduly limit the evidence of the government should not be granted. Rubio v. United States (C. C. A.) 22 F.(2d) 766; Robinson v. United States (C. C. A.) 33 F.(2d) 238; United States v. Brown (D. C.) 56 F.(2d) 659. In this case all the essential elements of the misapplication charged, including the time, place, and means of bringing it about, were set forth in the indictment. The information which it contained, together with the copy of the Ganley note, which the government was required to furnish under the defendant's motion, sufficiently advised him of the nature of the transaction constituting the crime and furnished adequate protection against a further prosecution for the same offense. The particulars requested, in so far as they were denied, called for evidence which the government might use in support of the allegations of the indictment, and their denial rested in the sound discretion of the court, which clearly was not abused in this instance. Wong Tai v. United States, 273 U. S. 77, 92, 47 S. Ct. 300, 71 L. Ed. 545; Hartzell v. United States (C. C. A.) 72 F.(2d) 569, 575; Rubio v. United States (C. C. A.) 22 F.(2d) 766, 767, 768; Horowitz v. United States (C. C. A.) 262 F. 48, 49. This disposes of the first assignment of error.

■ Both defendants demurred to the indictment. Mulloney filed a motion to quash. The motion adds nothing to the questions raised by the demurrers. Both demurrers are substantially the same. The main complaints are (1) that the first count does not state an offense against the laws of the United States, and (2) that it is so indefinite and uncertain as not to inform the defendants of the nature of the accusation against them, and because of its indefiniteness does not conform to the requirements of the Sixth Amendment of the Constitution; and (3) that it is contra-

dictory and duplicitous—that it is the latter because it charges three offenses in one count (misapplication of moneys, funds, and credits)—and is contradictory in that it charges Mulloney himself with an offense and also charges that it was committed by him through the exercise of an alleged control, direction, and management over the affairs of the bank.

We have carefully examined the indictment and the grounds of the demurrers and motion to quash, and are of the opinion that the District Court committed no error in overruling each of them. This disposes of Mulloney's second and third assignments of error and the first assignment of defendant Deery.

The demurrers to the indictment having been overruled, the defendants pleaded not guilty. In such a situation it has been held that "the demurrer was, in legal effect, withdrawn from the record, and nothing remained upon which the exception could be founded." Hillegass v. United States, 183 F. 199, 201, 202 (C. C. A. 3d Circuit).

■ Mulloney filed a plea in abatement to the indictment. The government filed a demurrer to and a motion to strike the plea. A hearing was had on the demurrer and motion and thereafter, and before decision, the government moved for leave to withdraw its demurrer and motion. In various ways, too numerous to mention, this defendant by exceptions and assignments of error has saved his rights, if any, to the action of the District Court in allowing the government to withdraw its demurrer and motion to strike. He asserts that he was entitled as of right to a decision of the issues raised by the demurrer to the plea; that, at that stage of the proceeding, he could not be deprived of that right by a withdrawal of the demurrer and motion; and that the court was without authority either as a matter of law or discretion to allow the withdrawal.

In allowing the government to withdraw its demurrer and motion, the District Court did so in the exercise of its discretion. It did not rule that it could withdraw as a matter of right. The questions thus arising are covered by assignments of error 4 to 17, inclusive, and by assignment 92. The defendant's contention apparently is that the government by demurring to the plea in abatement waived beyond recall its right to a trial of the questions of fact raised by the plea, and, this

being so, he was entitled to a decision on the legal sufficiency of the plea and to a judgment abating the indictment in case the demurrer was overruled.

The government's position is that, if its motion to strike had been denied and its demurrer had been overruled, it would have been entitled to answer over to the plea; that the overruling of the demurrer merely would have decided that, as a matter of law, the allegations of the plea, if proved, were sufficient to abate the indictment; that had the demurrer been overruled the government could have pleaded to the merits of the plea, and, such being the case, the defendant was not harmed by the government being permitted to withdraw its demurrer and motion; and that the filing of the demurrer and the hearing thereon did not place the defendant Mulloney in jeopardy.

We think the District Court in the exercise of its discretion could allow the government to withdraw its demurrer and motion before decision, as it did. In Bishop's Criminal Procedure (2 Bish. Crim. Proc. § 784) it is pointed out that in this country, even on the overruling of a demurrer to an indictment for a misdemeanor, the court may grant a defendant leave to withdraw his demurrer. It is there said: "With us, in misdemeanor, the judgment against a defendant on his demurrer is final, unless he has leave to withdraw it or answer." It was the usual thing at common law for the court to allow a defendant, who had demurred to an indictment for a felony, to plead over after his demurrer was overruled. Hillegass v. United States (C. C. A.) 183 F. 199, 201, 202. Congress in section 1026 of the Revised Statutes (18 USCA § 561) made what formerly had been discretionary with the court a right of the defendant, for it provided that the judgment on demurrer should be respondeat ouster. The offense denounced in section 5209 is a felony. United States v. De Walt, 128 U. S. 393, 9 S. Ct. 111, 32 L. Ed. 485; In re Claasen, 140 U. S. 200, 11 S. Ct. 735, 35 L. Ed. 409; Folsom v. United States, 160 U. S. 121, 16 S. Ct. 222, 40 L. Ed. 363; Sheridan v. United States (C. C. A.) 236 F. 305, 309, 310, certiorari denied, 243 U. S. 638, 37 S. Ct. 402, 61 L. Ed. 942.

If the court may, after the overruling of a demurrer to an indictment charging a felony or misdemeanor, allow the defendant to plead to the merits, we think the District Court had discretion to allow the government to withdraw its motion to strike and its demurrer to the plea in abatement at the time it did; that the defendant had acquired no right not to have the merits of his plea determined. It was so ruled in People v. O'Neill, 107 Mich. 556, 65 N. W. 540; and Mullins v. Commonwealth, 115 Va. 945, 79 S. E. 324. See, also, State v. Barrett, 54 Ind. 434.

 The government's demurrer and motion to strike having been withdrawn, it filed answers denying the allegations of the nine pleas in abatement and a trial by jury was had.

It appears that there were nine different indictments, the first four of which were numbered 12395, 12396, 12397, and 12399, and the remaining five 12402, 12403, 12404, 12408, and 12409, to each of which a plea in abatement was filed; that these indictments were consolidated for the trial of the pleas in abatement and for that purpose only; that the indictment numbered 12395, the one here in question, was procured before a grand jury for the Massachusetts District at the September term 1933, of the District Court for that district, and indictment No. 12395, the plea in abatement filed thereto, and the answer to the plea, constitute the pleadings out of which the matters arise that are now here in question. Three of the other indictments were found at the September term by the same grand jury, and the last five indictments by another grand jury for the Massachusetts District in November, 1933. While indictment No. 12395 was against Mulloney and Deery, the record fails to show just whom all the other indictments were against. It does appear, however, that a grand jury sitting for the Massachusetts District at the June term, 1933, of the District Court returned two indictments against Mulloney in August, neither of which is included in the above-consolidated list of indictments. But what those indictments were for the record does not disclose; they are simply referred to as the "first two indictments brought against Mr. Mulloney."

In the eighteenth assignment of error the defendants complain of the ruling of the court as to a question asked of the witness Coonin, as follows: "And the matter—I mean the matter of the Inman Trust Realty Trust—is one of the matters which is involved in the first indictment brought against Mr. Mulloney?" As this question

related to one of the "first two indictments," it was objected to as having no bearing on the questions before the court and for this reason the court declined to permit the question to be answered, stating that the first indictment would not be before the jury; that reference to that indictment had better be avoided as they were not going to try it over again. We fail to see wherein the ruling was improper.

The nineteenth assignment related to the following question, asked of the witness McCann: "If you had obtained the stock certificates named in the subpoena, would you·have used them?" The defendant takes nothing by this assignment. The certificates of stock were not produced in answer to the subpœna or at any time and it is immaterial what use the witness, the prosecuting attorney, would have made of them.

The twentieth assignment relates to a question also asked of the witness McCann: "Now, did it seem important to show the grand jury seeking those indictments that Mr. Mulloney was in a position to exercise control over the Inman Trust Company or over Mr. Fenderson?"

That question had no relation to the procurement of the indictment now before us (No. 12395) against Mulloney as principal and Deery as abettor, but to the procurement of another indictment against Fenderson as principal and Mulloney as abettor, arising out of transactions connected with the Inman Trust Company of which Mr. Fenderson was treasurer; and whether it seemed important to McCann or not was immaterial. The defendant takes nothing by this exception.

Assignments 22 and 23 relate to the following question asked by the defendant of the same witness: "Have counsel for Mr. Mulloney asked you for a transcript of that examination?" The record shows that the court, on its own motion, excluded that question and that thereafter the defendant followed it up by asking, "Did you decline to furnish them with the transcript?" which question the court likewise excluded; and that then counsel for defendant stated: "May I not for the purposes of the record, say that I expected an answer 'yes' to each of the questions." It appears from the defendant's brief that his counsel had filed a formal motion with the court asking for the transcript; that

each side had filed briefs with respect to the matter and the court had held that the document was privileged and need not be produced. The ruling of the court was correct and should have been heeded.

The defendant takes nothing by his assignments of error 25, 26, 27, and 30. The questions there referred to are all of an argumentative nature and for that reason alone were properly excluded. They were asked of the defendant's witness. Counsel for defendant was not entitled to ask argumentative questions and to cross-examine his own witness without the permission of the court.

The "commission" of the Special Attorney General referred to in assignments of error 28 and 29 had nothing to do with this case. It was not the authority under which he acted when the indictment in question was procured in September, 1933, or the investigation before the grand jury was had on July 25, 1933. It was properly excluded not only for this reason but because it was a confidential communication.

The questions asked the witness Johnson, referred to in assignments of error 31 and 32, were properly excluded. They relate to what the witness, a grand juror, may have heard the members of the grand jury say among themselves on July 25, 1933, with reference to the nonproduction of the books and papers which Mulloney failed to produce before them in answer to a subpoena. What, if anything, the grand jurors then said among themselves with relation to Mulloney's failure to produce the books and papers had no bearing on the validity of the indictment here in question found by a different grand jury at the September term, 1933.

The question asked of the witness Bagnulo, referred to in assignment No. 33, had no relation to any issue then on trial and was properly excluded. The question was highly improper and could have been asked for no other purpose than to create prejudice.

The jury found verdicts against the defendant Mulloney on the pleas in abatement, including the plea in abatement to the indictment (No. 12395) here under consideration. At the close of all the evidence the defendant moved for a directed verdict, and later submitted forty-five requests for instructions and took a number of exceptions to the charge. These are cov-

ered by assignments of error 34 to 91, inclusive.

The evidence in support of the plea was conflicting. It certainly could not be said that no other conclusion could be drawn from it than a verdict sustaining the plea. The motion was properly denied.

The allegations of the plea in abatement were, in substance: (1) That a legally constituted grand jury for the District of Massachusetts was sitting on July 25, 1933; (2) that Irving G. McCann, purporting to act under a commission of the Attorney General of the United States of July 17, 1933, a copy of which was annexed, was present and conducting the proceedings on July 25, 1933; (3) that on July 21, 1933, "a United States subpoena in the usual form," was duly issued and served on Mulloney requiring him to appear before a grand jury on July 25, 1933 (annexing a copy of the subpœna); (4) that Mulloney, in answer to the subpœna, appeared before the grand jury on July 25, 1933, was sworn, and gave testimony; (5) that the defendant did not waive his constitutional rights, was not warned as to them, and was ignorant of the purpose of his presence there; (6) that McCann willfully deceived the defendant as to the purpose of his presence and the nature of the proceeding; (7) that the defendant testified (a) as to material matters relating to the Federal National Investment Trust, its officers and trustees, (b) as to certain individuals named in McCann's commission, (c) as to *their and his books, assets, and affairs,* (d) as to the whereabouts of the books and assets of the Federal National Investment Trust, (e) that the Federal National Investment Trust owned a controlling interest in the Inman Trust Company and all the stock of the Inman Trust Realty Trust, and a substantial interest in other banks named in McCann's commission, except one, and (f) that the said Federal National Investment Trust was intimately connected with the Federal National Bank (but did not say how); (8) that the Federal National Investment Trust was a trust, not a corporation, and the defendant was its president and one of its five trustees; (9) that said grand jury thereafter returned two indictments (numbered 12367 and 12368) [not in this case] against the defendant relating to transactions between the Federal National Bank and the Inman Trust Company and the Inman Trust Realty Trust;

(10) that the term of the grand jury sitting in July, 1933, having expired, another grand jury for the district, in September, 1933, under the supervision and direction of the said McCann, returned this indictment (12395) and four other indictments, and in October, 1933, five others, all for offenses under section 5209 of the Revised Statutes (12 USCA § 592).

The defendant further alleged that his testimony thus given was relevant and material to the matters under consideration and involved in the indictments returned by the second grand jury sitting in September, "proving or tending to prove a connection of this defendant, * * * with the matters involved in the indictments, which would not have been disclosed except for the unlawful and willful compulsion of this defendant and the deception practiced upon him," and "that it [his testimony] was *in fact* connected with the indictments in one or more of the manners above set forth, and *was used* by the government * * * in obtaining said indictments, and in obtaining evidence *used* before the grand juries in obtaining said indictments." The prayer was that "the indictment in this case * * * be abated and quashed."

The government's answer denied every material fact alleged in the defendant's plea.

■ The defendant's plea in abatement was in fact his declaration by which he sought the annulment of the indictment here in question and, the government having pleaded a general denial, the burden was upon the defendant to prove every material fact alleged in his plea.

■ While in the plea it is alleged that McCann was present before the grand jury sitting at the June session of the District Court on July 25, 1933, and that his commission did not authorize him to be there, it does not allege that he was before the grand jury sitting in September at the September term, 1933, of the District Court, which returned this indictment (No. 12395). But assuming that it does, the defendant takes nothing by his assignment of error as to this, for in the commission issued to McCann July 17, 1933, appointing or retaining him as Special Assistant to the Attorney General, he was specifically "directed to conduct in the District of Massachusetts any kind of legal proceeding, civil or criminal, including grand **jury**

proceedings and proceedings before committing magistrates, which the United States District Attorneys are authorized by law to conduct." It was not a blanket or roving commission, as defendant contends, but by its terms was limited to "matters hereafter mentioned," the nature of which were thereafter set out in the commission, and his presence in the grand jury room, if he was present, when this indictment was obtained in September, was lawful, and ·was equally so on July 25, 1933, before the grand jury sitting at the June ·term of the District Court. We fail to see how his presence before the latter grand jury could, in the remotest degree, have anything to do with the indictment in this case returned at the September term.

 Counsel for defendant in their brief contend that the defendant Mulloney, when he appeared before the grand jury on July 25, 1933, by his mere presence and by answers to questions gave self-incriminating testimony in fact directly connected with or that directly or indirectly related to and bore upon the matters involved in this indictment (No. 12395), and that was used ·in its procurement. Whether by his presence and testimony he gave such evidence, whether it pertained directly or indirectly to the matters involved in this indictment, and whether it was used in its procurement, were all questions of fact which were submitted to the jury, found against the defendant, and are not open to review here.

 Whether the instruction of the court to the jury as to the mere presence of Mulloney before the grand jury on July 25, 1933—that, if he appeared as a party and not as a witness, it would prejudice his rights and render the indictment void— was correct or not as applied to a prior indictment found against him by a grand jury before which he appeared, we need not determine, for the prior indictment or indictments are not here in question. He did not appear before the September grand jury which brought in this indictment, and we are unable to see wherein his mere appearance and failure to produce the books and papers called for by the subpoena before the grand jury on July 25, 1933, could have any relation to the finding of this indictment by a subsequent grand jury in September, unless evidence of his appearance and failure to produce the books and papers was, if incriminating and material to this indictment, presented before the grand jury sitting in September—of which there was no evidence and as to which the jury found against the defendant.

 On the question whether Mulloney, having been sworn, was compelled to testify before the grand jury on July 25, 1933, and did in fact testify, the court instructed the jury that:

"Compulsion is the opposite of willingness. I think that you could find, from the evidence here, that Mr. Mulloney was not willing to testify until he was sure, or at least assured, that he was not being asked to give evidence against himself. * * * If you find that he was deceived by the words 'at that time' [that no indictment was being sought against him 'at that time'] or any other words in Mr. McCann's answer, or, if you find from the whole preliminary conversation in the grand jury room that Mr. Mulloney was induced to testify on false representation, or a misunderstanding of his position, based upon any misrepresentation made by the Government attorney, and that his rights were not waived by him, then he stands as if testifying under compulsion. Of course, if he did waive his privilege and did, understanding his rights, undertake to testify, that is his privilege, and that would be the end of the case right there."

This instruction was correct and there was nothing in the balance of the court's charge to the jury that could lead them to understand that he meant anything different from what he had thus expressly stated to them. Later, in speaking of the evidence as to whether Mulloney testified willingly or under compulsion, the court said:

"You will recall that there was a colloquy· of .some few minutes between him and the Government prosecutor before he was willing to testify. I haven't already noted that. But I have already said that I wouldn't find fault with your considering that, after all, he was probably in a legal way compelled to testify."

This instruction surely did not harm the defendant.

 The court rightly refused to rule as requested in the forty-fourth and forty-fifth assignments of error. The burden of proof was on the defendant to establish the facts alleged in his plea and did not shift whether the government *desired* the books and papers enumerated in the subpoena because it *believed* they contained incriminat-

ing matter or not. The defendant alleged in his plea that the books, papers, and his testimony were "in fact connected with the indictments [pleaded to] * * * and 'were' used by the Government * * * in obtaining said indictments, and in obtaining evidence *used* before the grand juries in obtaining said indictments," and it was encumbent upon him to prove this. Whether the books and papers contained incriminating matter and whether it related to this indictment or not was mere conjecture. The books and papers were not in evidence before the jury that passed on the plea in abatement and were not produced or used before the grand jury finding this indictment.

■ Requests 31, 40, 41, 42, 43, and 44 were also properly denied. They are predicated upon the idea that, without evidence that the books and papers contained incriminating matter, the jury could find or assume that they did and should find the plea in abatement for the defendant without regard to the use of such evidence in the procurement of this indictment. Counsel for defendant seems to indulge in the idea that the books and papers were privileged, that they were produced, that they contained incriminating matter, that the incriminating matter related to the charge in this indictment, and, finally, that without evidence of its use before the grand jury returning this indictment, the plea in abatement should be found in his favor for the reason that there is a conclusive presumption that it was used. This seems a pure flight of the imagination and needs no further comment.

■ Counsel further contends that if Mulloney by his presence or testimony before the grand jury on July 25, 1933, gave self-incriminating evidence there is a conclusive presumption that the government used it in procuring this indictment found by the grand jury sitting in September and that he was excused from furnishing proof that it was in fact used. We think the mere statement of the proposition is sufficient for its refutation.

■ The court charged the jury that the government had the right to subpœna Mulloney to bring the books and papers before the grand jury. The defendant contends that this was error; that under the Fifth Amendment the books and papers stood as privileged matter which he was not required to produce. They were not the de-

fendant's private books and papers but the property of the Federal National Investment Trust, organized under Massachusetts law. This association or so-called trust had practically all the attributes of a corporation. It had shareholders; the shares were transferable; the trustees were not liable personally; and it could make no contracts binding the shareholders personally. It was a distinct entity and, under the laws of Massachusetts, could be sued in its own name without joining the shareholders. G. L. Mass. c. 182, § 6.

In Grant v. United States, 227 U. S. 74, 33 S. Ct. 190, 57 L. Ed. 423, the sole stockholder of a defunct corporation was summoned to produce the corporation's books and it was held that he was not privileged from producing them under the Fifth Amendment. In United States v. Invader Oil Co. (D. C.) 5 F.(2d) 715, the same ruling was made in regard to a trust of the nature of the one here in question. In that case the question was whether the party summoned should be required to produce the books in view of the Fifth Amendment. We have no such question here. Although the books and papers were not produced their production is not here sought. Had they been produced and used before the grand jury finding this indictment, then whether they were privileged or not would be material. See, also, Hemphill v. Orloff, 277 U. S. 537, 48 S. Ct. 577, 72 L. Ed. 978.

The defendant takes nothing by assignments of error 54 and 55.

■ It is also suggested in assignments of error 48 and 49 that if the books and papers were nonprivileged and Mulloney might have been required to produce them under the subpœna duces tecum, if in his custody, he could not be compelled to testify where they could be found or to give the names of the persons through whom they might be located if not in his custody. Mulloney did not assert his constitutional right and refuse to testify. He was not ignorant of his rights; he was trained as a lawyer and admitted to the bar and was a man of wide experience. He had consulted his attorney in regard to this matter just before going before the grand jury. He testified of his own free will, unless he was tricked into testifying by the prosecuting attorney. The jury found, under proper instructions heretofore referred to, that he was not tricked or deceived but testified

willingly. But, as before stated, the books and papers were not produced either before the grand jury that found this indictment or before the jury passing on the plea in abatement, and whatever he said about the location of the books and papers apparently did not lead to their discovery or a disclosure of what they contained. The jury were fully and adequately instructed in regard to this matter. The defendant takes nothing by his assignments 48 and 49.

Although the defendant alleged in his plea that the testimony he gave before the grand jury on July 25, 1933, was in fact incriminating or led to the discovery of such facts, and that it was *used* before the grand jury finding the indictment here in question, he now complains that, because the court in its charge to the jury in substance told them that unless the testimony Mulloney gave before the grand jury was incriminating or led to the discovery of evidence that was incriminating, and, in either case, was in fact used before the grand jury returning this indictment, the plea in abatement could not be sustained. Wherein this was error we fail to see. Unless the testimony of Mulloney or his conduct in failing to produce the books and papers was of an incriminating nature or led to the discovery of evidence of an incriminating nature, which was used before the grand jury in finding this indictment, the defendant cannot complain.

The court charged the jury that if they found Mulloney testified before the grand jury on July 25, 1933, that he was president of the Federal National Bank or that he was president of the Federal National Investment Trust, they were to find whether what he said in each instance was incriminating; that from his point of view what Mulloney said about being president of the Federal National Bank was not; that everybody knew he was president of that bank; and that to say what everybody knew was not to make an injurious disclosure. And in regard to his testimony that he was president of the Federal National Investment Trust, it seemed to him that was not incriminating, as it was a matter of record at the State House. The jury were fully instructed that it was for them to decide all questions of fact; that they were at liberty to disregard his opinion if they thought it wrong. This was not error.

There is no question of immunity here. No such question can arise in the absence of a statute granting immunity to a person giving testimony of an incriminating nature. There is no statute under which Mulloney can claim immunity because of what he said or did before the grand jury on July 25, 1933. Kaplan v. United States (C. C. A.) 7 F.(2d) 594 (certiorari denied, 269 U. S. 582, 46 S. Ct. 107, 70 L. Ed. 423). See, also, Ziang Sung Wan v. United States, 266 U. S. 1, 15, 45 S. Ct. 1, 69 L. Ed. 131.

Although the district judge at times expressed his opinion as to the evidence he was careful throughout to give the jury to understand that they were the sole judges of the facts, irrespective of what he thought in regard to them. This was his right and in its exercise he acted discreetly.

This disposes of assignments 51, 52, 53, 63, and 65.

Assignment of error 75 has no relation to this indictment. By its terms it specifically relates to the other indictments pleaded to; and the subject-matter of assignment 76 relates to the same indictments.

On the question whether there was a criminal proceeding pending against Mulloney when he appeared before the grand jury on July 25, 1933, in answer to the *subpœna*, and whether it was a violation of his constitutional rights under the Fifth Amendment to swear him as a witness and ask him a question, even an inconsequential one, the court charged the jury as follows:

"That this was a criminal case—and notice this language that I have quoted uses the words 'criminal case,' 'No person shall be compelled in any criminal case to be a witness against himself'—within the meaning of this section of the Constitution, there can, I think, be no doubt. The grand jury was hearing evidence of the possible commission of crime. The activities of the defendant and others in connection with certain banks were being investigated by the officers of the Government. A criminal investigation was in progress last July, but at that time, I feel constrained to rule, it had not ripened into a criminal prosecution against any particular person. That came later in August, when the indictments were brought in. Criminal pro-

ceedings cannot be said to be brought or instituted until a formal charge is openly made against the accused, either by indictment presented or information filed in court, or at least by a complaint before a magistrate. The distinction is important. If there had been previously [a] criminal information or complaint filed in court, or before a magistrate, it would have been a violation of his Constitutional rights to have asked him any questions whatever after he was sworn before the grand jury, unless, of course, he was willing to testify. A man can always waive his privilege to testify against himself, if he desires. If Mr. Mulloney had been a party when he was called as a witness, if, for instance, a complaint and warrant had been issued against him and he was under bail to await the action of the grand jury, and after he had been called and sworn he had been asked how old he was, or how much he weighed or any inconsequential question and he had been compelled to answer, it would have been a violation of his rights then and there, and any indictment against him would have been void. To call a defendant before a grand jury may jeopardize his rights, even by his appearance, as it was suggested by counsel in argument this morning, although in this case, so far as that matter of the appearance is concerned, it might be well to note that the grand jury which brought in these indictments was another grand jury altogether than the one sitting in July when Mr. Mulloney testified. As a matter of fact, these indictments were found by a grand jury sitting along some time in August or later on, in November, I believe. But here, where an investigation had not then resulted in a criminal prosecution against any one, certain questions could be asked without infringing his Constitutional rights, depending upon whether or not his answers would be injurious to him."

The defendant contends that this portion of the charge is incorrect; that it was a question of fact for the jury to say on the evidence whether a criminal prosecution against Mulloney as a party defendant had been begun or was pending against him. This question was before the Supreme Court in Post v. United States, 161 U. S. 583, 587, 16 S. Ct. 611, 613, 40 L. Ed. 816. It was there said:

"Criminal proceedings cannot be said to be brought or instituted until a formal charge is openly made against the accused, either by indictment presented or information filed in court, or, at the least, by complaint before a magistrate. Virginia v. Paul, 148 U. S. 107, 119, 121, 13 S. Ct. 536 [37 L. Ed. 386]; Rex v. Phillips, Russ. & Ry. 369; Reg. v. Parker, Leigh & C. 459, 9 Cox, Cr. Cas. 475. The submission of a bill of indictment by the attorney for the government to the grand jury, and the examination of witnesses before them, are both in secret, and are no part of the criminal proceedings against the accused, but are merely to assist the grand jury in determining whether such proceedings shall be commenced. The grand jury may ignore the bill, and decline to find any indictment; and it cannot be known whether any proceedings will be instituted against the accused until an indictment against him is presented in open court."

The decision in the Post Case we regard as conclusive of the question whether a criminal prosecution was pending against Mulloney at the time he was called to testify and produce books and papers before the grand jury. The question whether it was in violation of his rights under the Fifth Amendment to require him to be sworn was the precise question involved in O'Connell v. United States (C. C. A.) 40 F.(2d) 201, 205 (certiorari denied, 281 U. S. 716, 50 S. Ct. 461, 74 L. Ed. 1136). It was there said:

"The final contention of the appellant is that, regardless of the details of his examination, it was a violation of his rights under the Fifth Amendment to require him to be sworn and examined before the grand jury, because its investigation, though ostensibly general, was in reality an attempt to secure from his own mouth evidence upon which to indict him. Some judicial support may be found for such a view. See People v. Gillette, 126 App. Div. 665, 668, 111 N. Y. S. 133; People v. Bermel, 71 Misc. 356, 357, 128 N. Y. S. 524. But it has not prevailed generally. United States v. Price, 163 F. 904 (C. C. S. D. N. Y.); United States v. Kimball, 117 F. 156 (C. C. S. D. N. Y.); Commonwealth v. Bolger, 229 Pa. 597, 602, 79 A. 113; State v. Cox, 87 Ohio St. 313, 346, 101 N. E. 135; State v. Howat, 107 Kan. 423, 430, 191 P. 585; Wigmore, Evidence (2d Ed.) § 2268. As Prof. Wigmore has aptly said, the constitutional provision is 'an option of refusal and not a prohibition of inquiry.' Were it otherwise, any

suspect would be sacrosanct, and witnesses most likely to know the facts could refuse any aid to an investigation of the crime. The mere summoning of a witness before the grand jury gives no basis for the assumption that his constitutional privilege will be impaired. His duty is to answer frankly until some question is propounded, the answer to which might tend to self-incrimination."

Both of these questions were considered by the court in United States v. Price (C. C.) 163 F. 904, 906. It was there said:

"The true doctrine is, I believe, established by national courts of controlling authority, and is that the submission of an indictment to a grand jury and the examination of witnesses before them in relation to the same are 'no part of criminal proceedings against the accused, but are merely to assist the grand jury in determining whether such proceedings shall be commenced.' Post v. United States, 161 U. S. 583, 16 S. Ct. 611, 40 L. Ed. 816; United States v. Reed, 2 Blatchf. 435, Fed. Cas. No. 16,134. It must, therefore, be held that Price and Haas were not on trial before the grand jury, were not parties to any proceeding then and there in progress, and must rest their claim of privilege or immunity upon the rights of a witness, and not those of a party.

"The constitutional provision is but the affirmance of the common-law maxim, 'Nemo tenetur seipsum accusare.' It cannot be understood without knowledge of the common-law rule, and is to be interpreted thereby. It is intended solely to prevent disclosures by persons acting as witnesses in any investigation, and has no logical or historical relation to the rights of parties as such. Counselman v. Hitchcock, 142 U. S. 547, 12 S. Ct. 195, 35 L. Ed. 1110; Kepner v. United States, 195 U. S. 100, 24 S. Ct. 797, 49 L. Ed. 114 [1 Ann. Cas. 655]; United States v. Wong Kim Ark, 169 U. S. 649, 18 S. Ct. 456, 42 L. Ed. 890; Brown v. Walker (C. C.) 70 F. [46], 48; Story on the Constitution, § 1288. The immunity of a party in a criminal case rests likewise upon a rule of the common law, long antedating the Constitution, and quite different from the rule regarding self-accusation, viz., the exclusion from the witness stand of all parties to the record, because their interest was thought to be so great as to render them unworthy of belief. Benson v. United States, 146 U. S. [325], 335, 13 S. Ct. 60,

36 L. Ed. 991. * * * Thus I think the defect of defendants' argument is shown by authorities controlling in courts whose prime duty it is to authoritatively expound the national Constitution: Price and Haas were not parties, but as witnesses claim a party's statutory (not constitutional) privilege. Regarding these men as witnesses only, it is settled law that no right either constitutional or statutory was infringed by compelling their attendance and administering the oath."

The trial judge in the portion of his charge above quoted committed no error such as is here relied on by the defendant. It would seem that in some respects it was too favorable to the defendant, but of this he cannot complain.

The defendant also complains of error in that portion of the charge wherein the court instructed the jury:

"These indictments, being regular on their face—and this is another rule that is important and for you to bear in mind—are presumed to have been properly and legally obtained by a duly constituted grand jury on legal and sufficient evidence until the contrary is shown. The presumption of legality stands until rebutted by proof that the fact is otherwise. It is not what is called a conclusive presumption. It ceases and disappears in the presence of evidence to the contrary."

We regard this charge as correct. Carlisle v. United States (C. C. A.) 194 F. 827; Carroll v. United States (C. C. A.) 16 F.(2d) 951; Tanner v. State, 163 Ga. 121, 135 S. E. 917, 919.

We have carefully examined the other assignments of error pertaining to the trial on the plea in abatement, both those relating to the charge and to the denial in whole or in part of requests for rulings and find no error in them.

With respect to the trial on the merits, counsel for the defendant Mulloney filed seventy assignments of error, and defendant Deery filed seven. Most of the assignments of error have no merit, and the record should never have been encumbered with them. The only assignments requiring special consideration are those raising the issue as to whether the judgment can be upheld on the findings of the trial judge who heard the case without a jury by consent of both the government and the respondents, and, if not, since he did not specially find all the facts, whether, in ad-

dition to the findings contained in the memorandum of decision, there is substantial evidence of the other facts necessary to support the judgment. The assignments of error raising this issue are numbered 119, 128, 133, 136, 140-142, 145, 147, 155, 158, 160-162. The other assignments of error in the trial on the merits either have no merit or the rulings excepted to do not appear on the record to have been prejudicial.

The allegations of the first count of the indictment have been heretofore set out.

According to the well-established rules of criminal pleading, it is not sufficient to allege the commission of a statutory crime in the language of the statute unless recourse to the statute clearly defines all the elements constituting the offense. It was held in United States v. Britton, 107 U. S. 655, 661, 2 S. Ct. 512, 27 L. Ed. 520; Evans v. United States, 153 U. S. 584, 14 S. Ct. 934, 38 L. Ed. 830, and in Batchelor v. United States, 156 U. S. 426, 429, 15 S. Ct. 446, 447, 39 L. Ed. 478, that the words "willfully misapplies" used in section 5209 of the Revised Statutes have no settled meaning and do not alone set forth every element necessary to constitute the offense described in that section of the statutes; and that "they must be supplemented by further averments, showing how the misapplication was made, and that it was an unlawful one. Without such averments, there is no sufficient description of the exact offense with which the defendant is charged, so as to enable him to defend himself against it."

It is, however, well settled that it is a sufficient description of an offense under section 5209, Rev. St. (12 USCA § 592), to allege that the respondent was an officer of a national banking association, and that he willfully misapplied funds of the association by converting them to his own or the use of some other person, coupled with a statement as to how the conversion was done and with the further allegation that it was done with intent to injure or defraud the association. The first count in the indictment, therefore, contains all the essential allegations. Agnew v. United States, 165 U. S. 36, 17 S. Ct. 235, 41 L. Ed. 624; Flickinger v. United States (C. C. A.) 150 F. 1; United States v. Morse et. al. (C. C.) 161 F. 429, 432, 433; Coffin v. United States, 162 U. S. 664, 675, 16 S. Ct. 943, 40 L. Ed. 1109.

The trial judge's definition of the offense described in section 5209 (12 USCA § 592) was assigned as error; but when the entire language used is considered, we think it does not constitute prejudicial error and was sufficiently favorable to the respondent when he said: "To be within the statute the transaction must therefore be obviously improper and unjustifiable when it was made, and there must be such probability of loss as to warrant a finding beyond a reasonable doubt that there was an intent to injure or defraud the bank."

It is not essential under section 5209 to allege that through the willful misapplication of funds of a national bank, the funds of the bank were wholly lost. If the intent to injure or defraud the bank is proven, the offense is committed, even though there was no loss. Showalter v. United States et al. (C. C. A.) 260 F. 719; Flickinger v. United States, supra; Morrissey v. United States (C. C. A.) 67 F. (2d) 267; Robinson v. United States (C. C. A.) 30 F.(2d) 25; Savitt v. United States (C. C. A.) 59 F.(2d) 541, 544; Matters v. United States (C. C. A.) 261 F. 826; United States v. Morse, supra.

Neither is it necessary to allege in the indictment that the willful misapplication of the funds was without the knowledge and consent of the bank or its board of directors. If there was such a consent, it is a matter of defense, the essential elements of the offense having been shown. United States v. Eno (C. C.) 56 F. 218; Flickinger v. United States, supra; Evans v. United States, supra; Olmstead et al. v. United States (C. C. A.) 29 F.(2d) 239.

It only becomes necessary, therefore, to warrant a finding of guilt for the government to prove under this indictment that Mulloney on the 29th day of September, 1931, willfully misapplied funds of the Federal National Bank, of which he was then the president and a director, to the amount of $131,000 by taking, without sufficient security as collateral, the demand note of Helen L. Ganley, who was without financial responsibility, and converted said sum to the use and benefit of John A. Deery or others, with intent to injure or defraud the bank, and that the respondent Deery aided and abetted him in such misapplication.

The court did not undertake to make special findings of all the ultimate

facts; but the following facts were found or are undisputed, or properly may have been found from the evidence: Mulloney for several years prior to September 29, 1931, was president of the Federal National Bank located in Boston. Affiliated with it by interlocking officials or otherwise, were several state banks or trust companies located in Salem and other Massachusetts cities. Mulloney and Deery were also largely interested as stockholders, or otherwise, in several other corporations, including the Salem Realty Company, which was a holder and operator of real estate and moving picture theatres; the Federal National Company, the chief purpose of which, so far as the evidence shows, was to purchase and hold stock of the Federal National Bank, of which Mulloney, Deery, and one Logan, another director of the Federal National Bank, were the sole stockholders. The Federal National Bank was interested in both the Salem Realty Company and the Federal National Company, either as the owner of stock or as pledgee for loans.

The other respondent, John A. Deery, was president of the Salem Trust Company, and also of the Salem Realty Company.

It is clear, we think, from the evidence that the Salem Trust Company in the year 1931 was in need of financial assistance. Its account with the Federal National Bank during the summer of 1931 and up to September 29 was frequently, if not almost continually, overdrawn. At the close of business on September 28, it was overdrawn over $22,000, and on the 29th, when the Ganley loan was put through, it was overdrawn over $50,000, and on October 2d, after this loan was granted, it was again overdrawn $35,000, and this increased until on October 24, 1931, the overdraft was over $135,000.

The Federal National Company during the same period, whatever value of its assets was, was also in need of ready money. It had been trying since July, 1931, to negotiate a loan from the Salem Trust Company on its note for $70,000, which Deery had refused, as the evidence indicates, because the Salem bank did not, until it received the benefit of the Ganley loan, have sufficient funds warranting the granting of so large a loan.

Some time in July, 1931, Deery told Mulloney that he was negotiating for the purchase by the Salem Realty Company of the Colonial Theatre property in Haver-

hill, and a loan from the Federal National Bank was mentioned by Deery in order to finance it.

In September he notified Mulloney that the terms of the purchase had been agreed upon, viz., $25,000 in cash and 25 bonds of the par value of $25,000, in consideration of which the equity was to be conveyed to the Salem Realty Company, subject to two mortgages, one for $105,000 to a savings bank, and a second mortgage for $131,000 which was to be assigned to his secretary, Helen L. Ganley.

He proposed to Mulloney that the Federal National Bank loan to Miss Ganley $131,000 on her demand note, with the second mortgage assigned as collateral security, and that the sum received over the cash outlay for the purchase of the theatre property would be turned over to the Salem Trust Company to improve its financial standing. It evidently was also understood, and the court so found, that with the granting of this loan the overdraft of the Salem Trust Company at the Federal National Bank would be taken care of and a loan of $70,000 would be granted to the Federal National Company by the Salem Trust Company.

Deery represented that through a new lease of the theatre to the Olympia Theatres, Inc., a subsidiary of the Paramount-Publix Corporation, the annual net receipts from rentals was approximately $7,500, and it was agreed between him and Mulloney that if the loan was granted, the Salem Realty Company would see that the sum of $625 should be paid monthly in reduction of the loan.

Mulloney then said he would present the application for the loan to the board of directors of the Federal National Bank, which he did on September 24th. It does not appear that a formal vote of approval was taken, but Mulloney testified that it was assented to in the manner in which applications for loans were usually disposed of. No objection being raised, it was considered approved without a show of hands or other evidence of assent, except an absence of objection.

Mulloney admitted that he did not inform his directors that the second mortgage and equity in the property was to be obtained by Deery for something less than $50,000; nor did he inform them that the second mortgage was long in default on both principal and interest. Stout **v.**

583

United States (C. C. A.) 227 F. 799, 802; Flickinger v. United States, supra.

It is, no doubt, true that consent by a bank to a loan would be a defense to the crime of willful misapplication, since there could be no conversion of funds if there was a valid consent by the bank or its board of directors.

The government contends, and we think correctly, that there was no valid assent in this case. The board consisted of ten directors and out of the eight directors who attended the meeting on September 24 and on October 2, on which dates it is claimed the loan was respectively assented to and approved, Deery was a director in the Salem Realty Company, and Mulloney, Deery, and Logan were the sole stockholders in the Federal National Company, and therefore interested in the transaction and were disqualified from voting or making up a quorum of the board. While action taken through interested members of a board of directors of a corporation is voidable and not void, and if later ratified by a proper vote or acquiesced in by the corporation, may be binding, Union Pacific Railroad Co. v. Credit Mobilier of America, 135 Mass. 367, 376; Kelley v. Newburyport & A. H. R. R., 141 Mass. 496, 499, 6 N. E. 745; there was no action later taken by a majority of the board qualified to act; nor does the record show it was ever acquiesced in by the bank with full knowledge of all the facts. Nor until after this indictment was found was any arrangement made by Miss Ganley or the Salem Realty Company to pay the note through new arrangements with the receiver as to the rate of interest and the amount of the monthly payments. We are, therefore, of the opinion that there was no error in the court's ruling that the action of the directors of itself was no defense for Mulloney and Deery. The fact that the new arrangement with the receiver of the Federal National Bank for the payment of the Ganley note was not made until after this indictment was found, may well have had some weight in the mind of the court.

It may be unfortunate for the defense that full explanation of the transaction relating to the loan of $70,000 to the Federal National Company was not received, but it was kept out mainly on the objection of counsel for Mulloney. Upon the record before the court, we think the trial judge was warranted in finding that the loan to Miss Ganley was made to assist Deery and the Salem Trust Company, and to enable it to make a loan of $70,000 to the Federal National Company.

How great the stress was on the Salem Trust Company at this time is shown by the fact that, notwithstanding the contribution of over $100,000 to its credit on September 29, 1931, made possible by Deery putting up bonds of the par value of $25,- 000 to acquire the equity in the theatre properties and the second mortgage, in less than a month its account was again overdrawn to the amount of over $135,000. The contribution to the Salem Trust Company from the loan is denominated in the testimony as profit from the loan; but if the Salem Realty Company kept its covenants with the lessee, and its guaranty to Miss Ganley, any actual profit to Deery or it from the loan would wholly disappear, together with the value of the bonds turned over by the Salem Realty Company, or Deery, as a part of the purchase price.

The effect of the stock market collapse in the late fall of 1929 and of the beginning of the world-wide business depression was already being severely felt by these banks. In less than three months the Salem Trust Company and the Federal National Bank were in the hands of receivers, and the lessee of the theatre reputed to have a huge net value in 1930 later went into the hands of a receiver. Impending financial troubles, augmented by those of the affiliated state banks, must have been apparent to both Mulloney and Deery in September, 1931.

If an intent to injure or defraud the bank when the loan was made is shown, it matters not whether the bank will lose any part of the loan, Showalter v. United States, and other cases cited supra. It is the unlawful intent to injure or defraud that is the essence of this offense.

In considering this phase of the case, as the court below pointed out, Mulloney was a trained banker and a member of the Bar. He knew that consent of the bank to this loan could not be obtained by a vote of less than a quorum of the board of directors, and that he, Deery, and Logan were all disqualified to vote or assent to the granting of the loan. He knew as a banker that a loan on the collateral presented, since Miss Ganley was without financial responsibility, was a very hazardous risk for the bank, as he finally ad-

mitted that the bank had no direct obligation of the Salem Realty Company to pay the note.

It appears that Miss Ganley, before she signed the note to the bank, insisted that a guarantee be given her that the payments on her note would be met. It evidently was also the understanding that the lease to the Olympia Theatres, Inc., should be assigned to the bank; but although the lease was found in the files of the bank, no written assignment of it was found.

We think upon the evidence that the court was warranted in finding that, though Mulloney professed to secure the approval of the loan by the bank, he made the loan without a valid consent of the board of directors to assist Deery and the already failing Salem Trust Company and indirectly to aid the Federal National Company by enabling it to obtain a large loan of the Salem Trust Company. That to aid these concerns in which he and Deery were both interested, he subjected the Federal National Bank to a risk and hazard which we think the court below properly held was not defensible. In other words, there was such a reckless disregard of the interests of his bank as to warrant a finding that there was an intent to injure or defraud it. The natural tendency of such a reckless disregard of the interests of the bank might well be to injure the bank, and he must be presumed to have intended the natural consequences of his acts.

■ As the court said in Galbreath v. United States (C. C. A.) 257 F. 648, 656: "An intent to injure or defraud, as contemplated by the statute, is not inconsistent with a desire for the ultimate success and welfare of the bank. It may, within the meaning of the law, result from an unlawful act voluntarily done, the natural tendency of which may have been to injure the bank. A wrongful misapplication of funds, even if made in the hope or belief that the bank's welfare would ultimately be promoted, is none the less a violation of the statute, if the necessary effect is or may be to injure or defraud the bank. Such is the well-settled law. United States v. Harper (C. C.) 33 F. 471; United States v. Kenney (C. C.) 90 F. 257; United States v. Breese (D. C.) 131 F. [915], 922, 923." Also, see, United States v. Breese et al. (C. C.) 173 F. 402, 408.

■ The motions for a directed verdict, a new trial, and an arrest of judgment must all fail. As to whether the evidence satisfied the trial judge beyond a reasonable doubt was a question of fact which he determined in favor of the government. As the effect of a finding of guilty by a judge hearing a case without a jury is the same as the verdict of a jury, the granting of a new trial lies in his discretion, and there was no error of law in the denial of the motion unless there was a clear abuse of discretion, which does not appear here. A motion in arrest of judgment is based solely on errors appearing on the record and not on the bill of exceptions. We find no such errors.

If Mulloney was guilty of the offense charged in the first count of the indictment, there can be no doubt as to the guilt of the respondent John A. Deery.

The judgments of the District Court are affirmed.

### On Petition for Rehearing.

PER CURIAM.

With reference to the defendant Mulloney's petition for rehearing on the ground that this court misunderstood the facts appearing in the record with reference to the interest of Mulloney, Deery, and Logan as stockholders in the Salem Realty Company, it appears that this was error. This, in part, has already been corrected as appears in the last paragraph on page 583 of the opinion; but the opinion also based their disqualification to vote on the loan to Miss Ganley upon the fact that they were the sole stockholders in the Federal National Company and directors of that company; and the trial judge held that the loan was made, in part, to aid the Federal National Company.

In the first full paragraph on page 582 of the opinion, after the words "as stockholders," in the thirteenth line thereof, the words "or otherwise," may be added.

It is also urged that the [former] statement in the opinion on page 582 that the loans to the Federal National Company from other banks were in default as to interest was not supported by the evidence. We think the evidence tends to show that it, was. However, this sentence is not essential to the result arrived at and may be stricken out.

■ It is also urged that the trial judge made no finding as to the disqualification of Mulloney, Deery, and Logan as directors of the Federal National Bank to vote on the

Ganley loan, and this question is not open in this court. The trial judge did not undertake to make special findings of all the ultimate facts, nor was he obliged to do so in his memorandum of decision. However, he also based his conclusions as to the guilt of the defendants on the ground that the loan was made without a full knowledge of the facts material to its security, which were not communicated to the board of directors by either Mulloney or Deery. We think it cannot be said that the loan was made with the assent of the bank or its board of directors, nor was it ever acquiesced in by the board with a full knowledge of the facts.

The third ground for rehearing is that the finding of the trial judge—that the loan to Miss Ganley was a real transaction and correctly entered on the books of the bank —constituting the reason for his discharging the defendants under the second count, is inconsistent with the general finding of guilt or any finding necessarily included in the general finding and supported by the evidence.

As to this it may be said there was no finding by the trial judge in his memorandum of decision that Miss Ganley was a straw maker and a dummy for John Deery, and no such finding was necessary to support the general finding of guilt. A loan to her, who was financially irresponsible, without sufficient security, and indirectly to aid the Salem Trust Company, through Deery, to establish its credit with the Federal National Bank and enable it to loan a large sum to the Federal National Company, might well result in injury to the Federal National Bank, which Mulloney and Deery must have known. It would constitute a misapplication of the funds of the bank if done without the requisite consent of the board of directors, as was the case here; and such a finding would be included in the general finding of guilt. This is the manner in which the trial judge specifically found the misapplication was brought about.

There was sufficient evidence to support such a finding and it would be included in the general finding of guilt, if the first count of the indictment charged a misapplication of the funds of the bank after that manner and form, so that the defendants would be informed thereof and enabled to defend against the charge. The first count, fairly construed, charges such a misapplication of the funds of the bank.

With the above changes in the opinion, the petition for rehearing is denied.