## UNITED STATES v. HAIM et al.
### No. 354.

Circuit Court of Appeals, Second Circuit.
July 1, 1940.

---

244

Joseph H. Wackerman, of Brooklyn, N. Y. (Arthur L. Burchell, of Brooklyn, N. Y., of counsel), for appellants.

Harold M. Kennedy, U. S. Atty., of Brooklyn, N. Y. (Vine H. Smith and Albert Lyons, Asst. U. S. Attys., both of Brooklyn, N. Y., of counsel), for appellee.

Before SWAN, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

The appellants, Charles Haim and William O. Sevecke, together with John L. Lotsch and Harold Nathan, were indicted, under 18 U.S.C.A. § 88, for conspiring to violate 12 U.S.C.A. § 592. Upon the request of the Assistant United States Attorney at the beginning of the trial, the case against Lotsch was severed and the action proceeded against Haim, Sevecke, and Nathan. Nathan entered a plea of guilty, and both Lotsch and Nathan were called as witnesses by the Government. The jury found Haim and Sevecke guilty as charged. The only serious issue before us is the sufficiency of the proof against these two appellants.

12 U.S.C.A. § 592 provides that any officer, director, agent, or employee of any Federal Reserve Bank or member bank or national banking association who embezzles, abstracts, or wilfully misapplies any of the moneys, funds, or credits of such bank is guilty of a misdemeanor and subject to fine and imprisonment. Any person who aids or abets the offending officer or director is also guilty of a like misdemeanor. Lotsch was the chairman of the board and the controlling stockholder of the Fort Greene National Bank, a national banking association and member of the federal reserve system; Sevecke, Lotsch's brother-in-law, was the assistant cashier in charge of liquor loans and was also a director of the bank from August, 1935, to September, 1936; Haim and Nathan were customers of the bank.

To support the charge of conspiracy the Government offered sufficient evidence of the following facts: Early in 1935, Haim was interested in the Millcreek Distillery in Cuba, and anxious to import large quantities of Millcreek whiskey into the United States. In order to finance these importations, he arranged with the Fort Greene National Bank to borrow from the bank on the basis of $2 per gallon of whiskey, with the warehouse receipts for the whiskey pledged as collateral for the loans. $2 a gallon was a generous valuation for this collateral, since the product was selling in the market for $2.25 to $2.50 per gallon at the time. Haim's borrowings soon reached $50,000. So long as the loans were fully secured, no law set a limit of $50,000 on credits to Haim; but Haim was given to understand that a bank rule prevented further extensions beyond that sum.

Accordingly Haim went to friends and relatives and persuaded them to seek loans from the bank as his nominees. Nathan and several others were introduced to Sevecke by Haim, and were granted loans of $2 per gallon on their notes secured by Millcreek whiskey warehouse receipts. Sevecke knew that each of these persons was a nominee of Haim, and that Haim had full power over each of the accounts comprising the proceeds of the loans. Several of the nominees represented their assets to be far more than was true; Nathan, who was one of such nominees, was an ex-convict who had changed his name in order to secure this line of credit from the bank. There was no direct evidence that Sevecke had knowledge of the dubious and irresponsible character of the nominees; nor, since Sevecke failed to take the stand, was there direct evidence of the care or lack of it which he displayed in investigating, if any investigation was made.

Financed in this manner by the bank, Haim continued to import his whiskey without difficulty throughout 1935. Because of the twenty per cent preferential reduction in customs duties accorded by the Cuban Trade Agreement of 1934, 49 Stat. 3559, 3561, art. 3, the duty upon Cuban whiskey was $4, instead of the usual $5 per proof gallon imposed by the Tariff Act of 1930, § 1, par. 802, 19 U.S.C.A. § 1001, par. 802. On January 1, 1936, the Canadian Trade Agreement, 49 Stat. 3960, 3962, 3980, became effective. By this, whiskey imported from Canada which had been aged in wooden containers for at least four years pays a duty of only $2.50 per proof gallon, and automatically the impost on Cuban whiskey of like age became $2 per gallon. 49 Stat. 3960, 3965, 3980. Unless, therefore, the whiskey in question

here was shown to have been so aged for at least four years, it would be subject to the $4 rate, a charge which would destroy its competitive value. Haim experienced considerable difficulty in making this proof. For a short time affidavits of age signed by one Bevan, president of the Millcreek Distillery, were accepted by the customs authorities. The customs agents refused, however, to release most of the whiskey, and Haim and his nominees defaulted on the bank's loans to an amount in excess of $350,000. The bank closed the following year (August, 1937). The warehouse receipts taken as security proved worthless, for the whiskey was never released from the warehouses.

Ample evidence was offered to justify the jury in believing the whiskey not to have been aged in the wood for four years after its manufacture. The Millcreek Distillery ceased production in 1933, at which time the stock on hand was divided between one Grosscurth, who testified for the Government, and Haim and his associates. The Haim group received a maximum of 1,834 barrels. Yet Haim obtained loans from the bank on warehouse receipts for 3,345 barrels of Millcreek four-year-old whiskey. While there were circumstances suggesting that Haim may have acquired from other sources enough genuine Millcreek whiskey to account for the discrepancy, the jury was entitled to reject this explanation in the light of other evidence before it to the effect that the whiskey was adulterated. Lotsch testified that in 1939, Haim admitted to him that he had had alcohol put into the whiskey and had placed it in old barrels newly purchased for the occasion. Other witnesses testified that Haim had purchased old barrels, that Haim had bought blending ingredients, and that one Scharlin had gone to Cuba at Haim's request and had adulterated the whiskey.

Yet these facts alone are not sufficient to convict the accused of conspiring to commit the misdemeanors of defrauding a bank through the act of a bank officer or director, and abetting the officer or director in so doing. If Sevecke knew that the whiskey was aged less than four years, he would have been in possession of knowledge that it was of little value and hence his approval of the loans would be a fraud upon the bank. As the case developed, therefore, such knowledge by Sevecke became a crucial issue. This the trial court recognized thoroughly, and in a careful

and discriminating charge it emphasized that the jury must find such knowledge. The question for us is whether there was basis in the evidence for the affirmative finding which the jury's verdict signifies.

As is to be expected in a conspiracy case of this form, the Government in the main is forced to rely upon circumstances which suggest a guilty knowledge rather than its direct proof. The activities of Sevecke to which the prosecution points as a basis for a finding that Sevecke knew of the facts making the whiskey such a poor risk are: the excessive amount of the loans in any event, being 80 and 90 per cent of the market value of the whiskey, exclusive of the duties and other expenses; the loans of equal amounts to nominees of Haim in the light of knowledge that they only represented him; failure to reveal to the Board of Directors that these nominees were only strawmen for Haim; transfer of various small amounts from Sevecke's own account to the accounts belonging to Haim to take care of temporary overdrafts on these accounts—eleven such transfers totalling $505 were made; and the making of additional loans to Haim after Sevecke knew that the age of the whiskey was suspect. Except for the last, these are all circumstances of a suspicious character, which clearly assume sinister significance only when more direct evidence of conspiracy appears. Without such evidence it is conceivable that they show no more than negligence or carelessness on Sevecke's part in exercising the power delegated to him to make the whiskey loans, or assiduous desire to be of service to, or to curry favor with, an important customer of the bank. With such evidence they could well appear to the jury as natural and effective steps in a scheme to unload dubious collateral on the bank.

We think that the necessary direct evidence is supplied by proof of the loans made after knowledge was brought home to Sevecke. The difficulty with the customs authorities developed soon after the change in the customs duty became effective. Sigmund Krauter, whose importing company was one of the Haim borrowers from the bank, testified that the first difficulties arose early in February or March, 1936. Lotsch testified that the first time they had trouble and the whiskey was moving slowly was "until about after the 15th day of January, 1936." He denied, however, that "we" had knowledge of "the

real age certificate trouble" until May of that year, when the matter became acute and he took it up with Haim. Lotsch then had retired from official position in the bank because he was being prosecuted for accepting gifts for loans at the bank, but he still remained the controlling stockholder.

The final link in the chain of evidence is supplied, however, by a customs agent, who testified that he took the matter up directly with Sevecke on June 6 and again on June 16, 1936. On the first occasion, as he said, he asked Sevecke if Sevecke knew about the age certificates filed by the Millcreek Distillery. Sevecke then said that Haim had told him there was "some question in the Government's mind" about the age of the whiskey, and they had filed the age certificates and Mr. Haim expected the matter to be straightened out in a short time. On the second occasion, the agent made specific inquiries as to some of the whiskey supporting the Krauter loans. Sevecke then said the bank was seriously considering filing a petition with the Secretary of the Treasury for the release of the whiskey. And yet, as the records of the bank show, Sevecke thereafter approved three loans to the Sigmund Krauter Importing Company—one on June 22, 1936, for $8,370 and two on July 14, 1936, for $5,000 and $2,594.75 respectively. On the latter date he also approved a loan of $50,000 to Samuel Wechsler, though this, it seems, was only a transfer of Harold Nathan's obligation to Wechsler, and not a further advance from the bank.

■■ This evidence would be sufficient to show a conspiracy at least as early as the time of these transactions. The jury was entitled to weigh Sevecke's explanation to the agent that Haim was about to secure the release of the whiskey in the light of the protracted controversy with the customs authorities, a controversy with which Sevecke was well acquainted, as his statement to the agent showed. The jurors could properly conclude that additions to the already heavy commitments in this line of credit made by Sevecke after he knew that the position taken by the customs agents had deprived the whiskey of value, at least temporarily—and, as it turned out, permanently—disclosed a conscious attempt to defraud the bank. Possibly these and the other circumstances referred to above were susceptible of other explanations, but

none was forthcoming. They are, therefore, competent evidence of a continuing conspiracy and justify the conviction of the accused. Mulloney v. United States, 1 Cir., 79 F.2d 566, 581, certiorari denied 296 U.S. 658, 56 S.Ct. 383, 80 L.Ed. 468; cf. United States v. Pandolfi, 2 Cir., 110 F.2d 736, certiorari denied 60 S.Ct. 1103, 84 L.Ed. —.

■ The court also charged the jury to the effect that though Lotsch was not being tried at the time, yet he was named as a conspirator and the jury must consider whether he was part and parcel of the conspiracy. Lotsch, as we have seen, denied knowledge of the lack of age of the whiskey until after his connection with the bank as an officer had ceased. He had not been as active as Sevecke in these loans while he was a bank officer. There were, however, circumstances of suspicion in his case. He was a heavy borrower from Haim personally, though this was concealed by the interposition of the name of a third party. In 1935, he borrowed $5,000 from the bank, pledging Millcreek whiskey warehouse receipts which Haim had delivered to him for the purpose. And when the loan matured it was paid by Haim. No explanation of this transaction and why Haim felt obliged or was willing so to act for Lotsch was vouchsafed. We think this, too, was a circumstance which the jury was entitled to consider as of cumulative effect, once facts definitely pointing to a conspiracy to defraud the bank had been shown.

■ Only one other attack on the rulings below deserves consideration. The defendants sought unsuccessfully to introduce into evidence two decisions of the United States Customs Court holding that certain shipments of Millcreek whiskey could be imported at the $2 rate. Some of this whiskey had been pledged with the Fort Greene National Bank, but the offer of proof did not contend that it was the whiskey pledged by Haim or his nominees. The Customs Court decisions stated that the affidavits of age signed by Bevan, the Millcreek president, were a sufficient compliance with the Treasury regulations. But that issue was irrelevant here. The rulings were not probative on the issue for which they were offered, namely, whether the whiskey pledged by the Haim group was aged for four years or had been adulterated.

Affirmed.